[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 19, 2004
THOMAS K. KAHN
CLERK**

No. 03-14850

D. C. Docket No. 03-01571 CV-T-26-EAJ

JUAN MANUEL TENORIO RUIZ,

Plaintiff-Appellant,

versus

MELISSA MARIE GREEN TENORIO,

Defendant-Appellee.

Appeal from the United States District Court
for the Middle District of Florida

**(October 19, 2004)**

Before ANDERSON, CARNES and BRIGHT[*], Circuit Judges.

PER CURIAM:

This case, dealing with habitual residency under the Hague Convention on

_____
[*] Honorable Myron H. Bright, United States Circuit Judge for the Eighth Circuit, sitting by designation.

the Civil Aspects of International Child Abduction, presents two issues of first impression in this circuit, the standard of review and the definition of habitual residency.

## I. BACKGROUND

Melissa Green Tenorio and Juan Tenorio Ruiz met when Melissa was an exchange student in Mexico. They began dating, and in May 1992, Melissa discovered she was pregnant. Melissa returned to Minnesota and had the baby, Juanito, in December. Juan visited when the baby was born and returned to Minnesota when he graduated from high school. He and Melissa married, moved in with Melissa's parents, and attended community college. Afterwards, Juan attended the University of Minnesota and graduated with a bachelor's degree. He then obtained employment with a St. Paul company. When Melissa finished community college, she went to nursing school. The family moved into its own apartment and had a second son, Javier, in 1998. However, the marriage was not a happy one, and Melissa's mother testified to at least one incident of domestic violence while the couple lived with her.

In an attempt to save the marriage, the couple decided to move to Mexico in August 2000, after seven years in the United States. The move was largely financed by Juan's father, and Juan went to work for his family's business. At the

time of the move, Juan and his father told Melissa's mother that it was for a trial period and that if it did not work out, the family would move back. Juan, however, testified that he intended to move the family to Mexico permanently. Juan and his father moved most of the family's possessions in a truck from Minnesota, leaving a few items behind. Melissa and the children flew to Mexico on tourist visas.

At first, the family lived with Juan's family, which led to tensions because Melissa apparently did not get along well with her in-laws. Melissa testified that her understanding of the move was that they would not even live in the same town as her in-laws. The family eventually moved into an apartment, and Juan's father began building an "American-style" house for the family. At some point during the family's time there, Juan either posted a résumé on or visited monster.com (a résumé forwarding internet site) with the intention of seeking employment in the United States. Apparently, Juan was also having difficulty with his father and brother in the family business. He began to drink more and more, and Melissa testified he missed at least one day a month because of his drinking. The domestic violence intensified. Juan was physically and verbally abusive, and Juan testified that Melissa "goaded" him.

Melissa and the children visited the United States twice during their two

3

years and ten months in Mexico; Melissa also visited by herself once. In each trip, Melissa went to Florida, where her sister lives. During her first visit, she opened a bank account, because she "planned on returning." On her second trip she went without the boys and obtained a Florida nursing license. Her last trip, in August 2002, took her and the children first to Minnesota and then to Florida. While there, she called Juan and said she was not returning. He convinced her to come back and give it another try, which she did. However, by November 2002, the couple had separated. On May 20, 2003, Melissa took the children to Florida without telling Juan and with no intention of returning. Juan learned of the abduction when he found no one at the home and the maid said that she had been fired.

Juan filed his petition for wrongful removal under the Hague Convention on July 29, 2003. The district court held a hearing on August 25, 2003 and denied Juan's petition, holding that Juan failed to prove that the habitual residence of the children was Mexico. The district court made findings of fact that the couple moved to Mexico in an attempt to save their marriage, with the idea of returning if it did not work; that within six months things were not working out; that Juan started to drink in excess; that even Juan was having second thoughts about staying; that Melissa's return to Mexico in 2002 was only an effort to save the

4

marriage; and that the two never had a shared intent to make Mexico the habitual residence of their children, but rather that the family was in limbo during that time. The district court concluded that Juan did not prove that the habitual residence for the children was in Mexico.

## II. DISCUSSION

Congress implemented the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670 ("Hague Convention") when it passed the International Child Abduction Remedies Act ("ICARA"). The Hague Convention was enacted to "secure the prompt return of children wrongfully removed to or retained in any Contracting State" and to "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1, T.I.A.S. No. 11,670, at 4. Under ICARA, a person may petition a court authorized to exercise jurisdiction in the place where a child is located for the return of the child to his or her habitual residence in another signatory country. 42 U.S.C. § 11603; Hague Convention, art. 3(a), T.I.A.S. No. 11,670, at 4. "The convention is intended as a rapid remedy for the left-behind parent to return to the status quo before the wrongful removal or retention." Shealy v. Shealy, 295 F.3d 1117, 1121 (10th Cir. 2002)(internal quotes and citations omitted). The court's

inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle.  42 U.S.C. § 11601(b)(4).

The operative provision in the Hague Convention is Article 3.  This article defines "wrongful" removal or retention of a child:

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention. The rights of custody mentioned in sub-paragraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Hague Convention, art. 3, T.I.A.S. No. 11,670, at 2.  Thus, the petitioner is required to establish, by a preponderance of the evidence, that his children were "wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A).  Therefore, in order to prevail, Juan had to prove that: (1) the children were "habitually resident" in Mexico at the time Melissa removed them to the United States; (2) the removal was in breach of Juan's custody rights under Mexican law; and (3) he had been exercising those rights at the time of

6

removal.  Hague Convention, art. 3, T.I.A.S. No. 11,670, at 2.[**]

Because the district court determined that the habitual residence of the children had not changed to Mexico, the dispositive issue on this appeal is whether the prior United States habitual residence of the children had been abandoned and a new habitual residence in Mexico had been established.  Before addressing that issue, however, we must determine the appropriate standard of review.

A. Standard of Review

The standard of review is an issue of first impression in this circuit.  Most of the circuits that have reached this issue have decided on a mixed standard, reviewing the district court's findings of fact for clear error and its legal determinations and application of the law to the facts de novo.  Silverman v. Silverman, 338 F.3d 886, 896-97 (8th Cir. 2003)(en banc); Miller v. Miller, 240 F.3d 392, 399 (4th Cir. 2001); Mozes v. Mozes, 239 F.3d 1067, 1073 (9th Cir. 2001); Blondin v. Dubois, 238 F.3d 153, 158 (2d Cir. 2001); England v. England, 234 F.3d 268, 270 (5th Cir. 2000); Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir. 1996); Feder v. Evans-Feder, 63 F.3d 217, 222 n.9 (3d Cir. 1995).  As

---

[**]  Had Juan satisfied the burden of proof, certain defenses would have been available to Melissa.  Because of our resolution of this case, we need not discuss such defenses.

explained by the court in <u>Feder</u>, this means that the court "accept[s] the district court's historical or narrative facts unless they are clearly erroneous, but exercis[es] plenary review of the court's choice of and interpretation of legal precepts and its application of those precepts to the facts." 63 F.3d at 222 n.9.

As part of an extensive discussion of the meaning of habitual residence, the court in <u>Mozes</u> explained why it was appropriate that the determination should be a mixed question of fact and law. 239 F.3d at 1071-73. First of all, Congress stated its desire for "uniform international interpretation of the Convention." <u>Id.</u> at 1071 (citing 42 U.S.C. § 11601(b)(3)(B)). The Perez-Vera Report[***] on the Hague Convention describes "habitual residence" as "'a well-established concept in the Hague Conference, which regards it as a question of pure fact, differing in that respect from domicile.'" <u>Id.</u> (quoting the Report at ¶ 66). However, the term is not defined in any of the Hague Conventions, despite being used throughout them. <u>Id.</u>

Courts have been instructed to interpret the expression according to "the ordinary and natural meaning of the two words it contains, as a question of fact to be decided by reference to all the circumstances of a particular case." <u>Id.</u> (citation

---

[***] Elisa Perez-Vera was the official Hague Conference reporter whose report is "recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it." <u>Shalit v. Coppe</u>, 182 F.3d 1124, 1137-28 (9th Cir. 1999)(internal quotations and citations omitted).

omitted). The court in <u>Mozes</u> explained that despite the term's primarily factual nature, courts must be able both to explain the meaning of those words and look to other cases for guidance. <u>Id.</u> at 1072. This reference to other cases helps to achieve the Convention's goal of uniformity of application across countries. <u>Id.</u> As the court in <u>Mozes</u> noted, "[t]his is what we refer to in American legal parlance as a mixed question of law and fact." <u>Id.</u> at 1073. We are persuaded by the reasoning of the court in <u>Mozes</u> that a mixed standard of review is appropriate for determining habitual residency. Accordingly, we accept the district court's finding of historical facts unless clearly erroneous, but with regard to the ultimate issue of habitual residency, the appellate court will review <u>de novo</u>, "consider[ing] legal concepts in the mix of facts and law and exercising judgment about the values that animate legal principles." <u>Id.</u>

B. <u>Had the Children Established Habitual Residency in Mexico?</u>

As mentioned above, the Hague Convention does not define habitual residency and neither does ICARA. The High Court of Justice in the United Kingdom has explained the lack of a definition this way:

> the notion [of habitual residence is] free from technical
> rules, which can produce rigidity and inconsistencies as
> between legal systems. . . . The facts and circumstances
> of each case should continue to be assessed without
> resort to presumptions or presuppositions. . . . All that is

necessary is that the purpose of living where one does
has a sufficient degree of continuity to be properly
described as settled.

In re Bates, No. CA 122.89 at 9-10, High Court of Justice, Fam.Div'n Ct.Royal Court of Justice, United Kingdom (1989) (citation omitted).   In Shah v. Barnet London Borough Council and other appeals, [1982] 1 All. E.R. 226 (Eng. H.L.), the court held that there must be a "settled purpose," which requires only that "the purpose of living where one does has a sufficient degree of continuity to be properly described as settled." Id. at 235.

As was noted in Mozes v. Mozes, 239 F.3d 1067, 1074 (9th Cir. 2001), such generalities are true, but not very useful.  After thoroughly canvassing the relevant case law, we conclude that the opinion of Judge Kozinski in Mozes is not only the most comprehensive discussion of the issue, but also sets out the most appropriate approach.  Accordingly, we summarize the approach suggested in Mozes as it is relevant to the facts of the instant case, and adopt it as our own.  The first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind.  Id. at 1075.  It is not necessary to have this settled intention at the time of departure, as it could develop during the course of a stay originally intended to be temporary.  Id.  "Whether there is a settled intention to abandon a prior habitual residence is a question of fact as to which we defer to the

10

district court." Id. at 1075-76. This settled intention is crucial because there can be no bright line rule with respect to the length of an absence. See id. at 1074 ("The absence of an objective temporal baseline, however, requires that we pay close attention to subjective intent."). With respect to whose intent is relevant, for the reasons set out in Mozes, we agree that the relevant "'intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence.'" Id. at 1076 (quoting E.M. Clive, The Concept of Habitual Residence, 1997 Jurid.Rev. 137, 144).[****]

The Mozes court noted that the difficult cases arise when the persons entitled to fix the child's residence do not agree on where it has been fixed. Id. at 1076. Mozes divided those cases into three categories: (1) where the court finds a shared settled purpose, despite one parent having "had qualms about the move," and where there is a finding that the "family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another"; and pointing in the other direction, (2) cases where the "initial

---

[****] By contrast, the court in Friedrich v. Friedrich, 983 F.2d 1396, 1401 (6th Cir. 1993), rejected of the use of parental intent. However, in that case, intent was not bolstered by physical presence: the child had never lived in the country to which he was removed, had lived in Germany for all of his life while his parents (one of whom was a German national) worked there, and was only removed when his parents' marriage disintegrated. Standing alone, of course the mother's intent that the child should one day live in the United States could not support a finding of habitual residence. Because of the facts in that case, we find its statement regarding parental intent unpersuasive. Accord Mozes, 239 F.3d at 1080.

11

translocation from an established habitual residence was clearly intended to be of a specific, delimited period." Id. at 1076-77. In between those cases, which are not so difficult, the Mozes court described the more difficult category 3 cases "where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration." Id. at 1077. With respect to these more difficult category 3 cases, the court stated:

> Sometimes the circumstances surrounding the child's stay are such that, despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely. When this is the case, we can reasonably infer a mutual abandonment of the child's prior habitual residence. Other times, however, circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment can be inferred. Clearly, this is one of those questions of "historical and narrative facts" in which the findings of the district court are entitled to great deference.

Id. at 1077-78 (footnotes omitted).

Although the settled intention of the parents is a crucial factor, it cannot alone transform the habitual residence. In addition, there must be an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized. Id. at 1078. The Mozes court provided the following guidelines with respect to the sufficiency of the child's acclimatization in cases in which there is uncertain or contrary parental intent. The court was critical of some

12

cases which placed too much emphasis on facts like the child doing well in school and with friends, concluding: "[d]espite the superficial appeal of focusing primarily on the child's contacts in the new country, however, we conclude that, in the absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned." Id. at 1079. The court explained its reasons: "The greater the ease with which habitual residence may be shifted without the consent of both parents, the greater the incentive to try." Id. The court also noted that divining the significance of such contacts is extremely difficult, and that children can be remarkably adaptable even in short time periods without any necessary significance with respect to habitual residence. Id. Thus, the court concluded that it made sense to "regard the intentions of the parents as affecting the length of time necessary for a child to become habitually resident, because the child's knowledge of these intentions is likely to color its attitude toward the contacts it is making." Id. at 1079-80. Finally, the Mozes court suggested that when there is no shared settled intent on the part of the parents to abandon the child's prior habitual residence, a court should find a change in habitual residence if the objective facts point unequivocally to a new habitual residence, or if the court could "say with confidence that the child's relative attachments to the two countries have changed to the point where

13

requiring a return to the original forum would now be tantamount to taking the child out of the family and social environment in which its life has developed." Id. at 1081 (quoting the Perez-Vera Report, at ¶ 11).

Applying the foregoing approach to the facts of this case, we conclude that the district court correctly determined that Juan failed to prove that the children's prior United States habitual residence had been abandoned and a new habitual residence in Mexico established. The instant case seems to fall within the more difficult category 3 cases described by Judge Kozinski in Mozes. 239 F.3d at 1077. In other words, here, as in Judge Kozinski's category 3 cases, "the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration." Id. The Mozes court held, and we agree, that in such circumstances the finding of "settled mutual intent from which such abandonment can be inferred," is a finding of historical fact entitled to review under the clearly erroneous standard. Id. We begin our analysis with the crucial finding of fact by the district court that Juan and Melissa never had a shared intention to abandon the prior United States habitual residence and to make Mexico the habitual residence of their children.

For the following reasons, we cannot conclude that the finding is clearly erroneous. The district court found that Juan and Melissa agreed to move to

14

Mexico for a trial period. The court expressly credited Melissa's mother who testified that Juan had promised that if it did not work out in Mexico, they would come back to the United States. Melissa's intent with respect to the move to Mexico was clearly conditional. In addition, there were numerous objective facts indicating Melissa's lack of intention to move permanently to Mexico: she retained bank accounts and credit cards in the United States; she had her American mail forwarded to an American address and not to Mexico; and she moved her nursing license to Florida shortly after she moved to Mexico. Even Juan's intention with respect to the permanence of the move to Mexico was ambiguous. He promised they would return if it did not work out. He also testified that he let his green card lapse because he did not know he had to renew it. Based upon Juan's exploration of job opportunities in the United States during his sojourn in Mexico and his maintenance of close contact with employees at his former work in Minnesota, the district court found as an historical fact that even Juan had second thoughts about staying in Mexico permanently. For the reasons indicated, we cannot conclude that the finding is clearly erroneous.

Because the absence of a shared and settled intention by the parents to abandon the previous United States habitual residence of the children is not dispositive, we next look to the relevant objective facts. It is true that the children

15

in the instant case remained in Mexico for a considerable period of time and that there was some evidence of their acclimatization; for example, they went to school, had social engagements, and took lessons. However, we agree with the Mozes court that "in the absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned." Id. at 1079. We also agree with the Mozes court that "when there is no settled intent on the part of the parents to abandon the child's prior habitual residence," courts should be hesitant to find a change in habitual residence unless objective facts point unequivocally to a change or the court can "say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount" to changing the child's family and social environment in which its life has developed. Id. at 1081.

Accepting the district court's finding of fact that there has been no shared intent to abandon the previous United States residence in this case, we cannot conclude that the objective facts either point unequivocally to a change of habitual residence or that returning the children to the United States would now amount to taking them out of the family and social environment in which their life has developed. To the contrary, the objective facts in the instant case point to a

16

determination that the prior United States residence has not been abandoned and habitual residence in Mexico has not been established. It is true of course that a number of objective facts point toward Mexico. The family did move there. Juan did undertake employment. A new house was being built for them. The sojourn in Mexico was of considerable length.

On the other hand, there is objective evidence that the move was intended to be conditional. There is evidence that Juan had difficulties with his brother. He was also having difficulties in his employment situation with his father and brother. There were marital problems. Juan's drinking problems may have been symptoms of these work and family problems, and undoubtedly exacerbated them. Other objective evidence more directly indicative of an absence of permanence with respect to the Mexico residence include Juan's own attempts to explore employment in the United States and Melissa's movement of her nursing license from Minnesota to Florida. The family lived with the in-laws, Juan's parents, for six months. Although a new house was being built for them, it was being built and provided by Juan's father. Indeed, it was Juan's father who appears to have been in control of the family's destiny. He moved them from Minnesota, provided them with a substantial loan, paid bills and taxes, and was the one building the family's house. Finally, Melissa retained credit cards and bank accounts in the

United States and had her mail forwarded to Florida instead of Mexico. On the basis of this evidence, the district court made a finding of fact that the family was in limbo during its stay in Mexico. In addition, Melissa and the children went to Mexico on tourist visas, and there is no evidence that either Juan or Melissa sought to acquire permanent legal status or Mexican citizenship for Melissa and the children.*****

Although we acknowledge that this is a relatively close case, we cannot conclude that the objective facts in the instant case are sufficient to indicate that the habitual residence of the children in the United States had been abandoned and a new habitual residence in Mexico had been established in light of the significant fact that there was never a settled mutual intention on the part of the parents to do so. We also acknowledge that the facts of the instant case are somewhat similar to those in Feder v. Evans-Feder, 63 F.3d 217 (3d Cir. 1995). In that case, the family moved to Australia after the father obtained employment there. The father moved first, about two months before his wife and son, and bought a new house in Australia in both his and his wife's names. The couple put their American house up for sale and shipped their furniture. The wife was ambivalent about moving to Australia: the marriage was in trouble but she decided to give it a chance. Once in

_____

***** Juan did so only after Melissa and the children had left Mexico.

18

Australia, the Feders lived in an apartment while the mother oversaw extensive renovations to the house and their child attended nursery school. He was enrolled to begin kindergarten the following year and the mother applied to have him admitted to a private school when he reached the fifth grade. To the school, she represented the child as both a permanent resident and an Australian citizen. She pursued contacts she had made during her initial visit with the Australian Opera and auditioned for a part; she won and accepted a part in a performance scheduled for February 1995. Additionally, the father changed his driver's license from Pennsylvania to Australia and completed the paperwork necessary to obtain permanent residency. The mother, by contrast, did not change her driver's license or submit to the physical exam or sign the necessary papers for permanent residency. All of the Feders enrolled in the Australian health system.

In early spring, the Feders discussed the mother's unhappiness and her desire to return to the United States. The father convinced her that things would improve once they moved into the new house and persuaded her to stay. They moved into the house in May but the relationship did not improve. The mother decided that she would return to the United States with the child but did not tell her husband of her plans; instead, she told him she was merely visiting her parents. Three weeks into her trip, the father joined her and she served him with divorce

papers.

The father returned to Australia but instituted proceedings against his wife for wrongful retention of their child in the United States. The district court held that the child was not a habitual resident of Australia because of the mother's ambivalence. However, the court of appeals reversed, holding that the child's habitual residence was Australia. The court reasoned that the parents' actions of buying and renovating a house, pursuing interests and employment, and arranging for the child's immediate and future schooling demonstrated that they were making a new home for themselves. 63 F.3d at 224. The court criticized the district court for focusing on the mother instead of the child and the circumstances of his life in Australia. Id. It noted that six months is a significant amount of time for a four year-old. Id.

Although the facts in Feder are similar to those of the instant case, there are significant distinctions, both with respect to a shared intent to abandon the prior habitual residence, and also with respect to the objective facts evidencing habitual residence. In the instant case, the district court found as a fact that there was no shared intent to abandon the United States as the habitual residence and take up residence in Mexico. As noted above, there is ample evidence to support this finding of fact, and we cannot conclude that the finding is clearly erroneous. By

20

contrast, in Feder, it is not clear from the appellate opinion that the district court made a finding of fact with respect to the couple's shared intent about their move from the United States to Australia. However, the Third Circuit appears to have assumed that there was a shared intent to abandon the prior United States habitual residence and take up a new habitual residence in Australia. Id. at 224 ("Although Mr. and Mrs. Feder viewed Australia very differently, both agreed to move to that country and live there with one another and their son . . .. That Mrs. Feder did not intend to remain in Australia permanently and believed that she would leave if her marriage did not improve does not void the couple's settled purpose to live as a family in the place where Mr. Feder had found work.") (emphasis added).******

The contrasting findings of fact with respect to this shared intent reflect, inter alia, the different historical facts in the two cases. In the instant case, Melissa's intention with respect to the move to Mexico was clearly conditional

_____

****** It is not clear from the Third Circuit's opinion whether or not the district court made a finding of fact with respect to the shared intent of the couple about their move to Australia or, if there was such a finding, whether the Third Circuit failed to defer thereto. We reiterate our agreement with Mozes that the district court's finding of fact with respect to parents' shared intent to abandon a prior habitual residence and take up a new habitual residence is an historical fact entitled to deference and should be reviewed under the clearly erroneous standard. Although the shared intent is an historical fact, the ultimate determination of habitual residence is not; rather, it is the result of the application of the applicable law to the underlying facts, and an appellate court's review of the ultimate determination of habitual residence is de novo. To the extent that the district court in Feder made a finding of fact that there was no shared intent of the parents to abandon the habitual residence in the United States and take up a new habitual residence in Australia, and to the extent that the Third Circuit failed to defer to such a finding, we would disagree.

21

upon improvements in their marriage, was expressed and in the open, and was well-known to Juan, as evidenced by his promise to Melissa's mother that the family would return if Mexico did not work out. Also, in the instant case, Juan's own intention to abandon habitual residence in the United States and take up habitual residence in Mexico was at least ambiguous. He had promised to return if things did not work out in Mexico; he experienced difficulties with his family and work while in Mexico; and he explored job possibilities in the United States while in Mexico.

By contrast, the husband in <u>Feder</u> moved to Australia, bought a house, and took his job, all without any apparent reservations or second thoughts. Although it is clear from the <u>Feder</u> opinion that Mrs. Feder was ambivalent about their move to Australia, the extent to which she made her reservations known and the timing thereof is less clear, and there is no suggestion that she exacted a promise to return if things did not work out.

Not only is <u>Feder</u> distinguished by the contrasting findings of fact with respect to the crucial factor of the shared intent to abandon a prior habitual residence and take up a new one, but also the two cases are different with respect to the objective facts bearing upon the abandonment of a prior habitual residence and taking up a new one. The two cases are similar with respect to the following

22

factors: in both the couples sold most of the family's possessions or moved them to the new location; in both the child or children attended schools or similar activities; in both the family acquired a house in the new location. However, the two cases involve several very different objective facts bearing upon the relevant issue: Mrs. Feder oversaw the attempt to sell the family house in United States; she supervised extensive renovations to the new house in Australia; she registered their son in a private school in Australia to commence seven years hence; and she explored employment in Australia and accepted a role for a performance of the Australia Opera. Similarly, Mr. Feder changed his driver's license to Australia and completed the paperwork necessary to obtain permanent residency for the entire family.

By contrast, in the instant case, no one attempted to obtain permanent residency in Mexico for Melissa and the children. Although Juan did have employment, there is evidence that it was not wholly satisfactory and he was exploring employment opportunities in the United States. Although the family was to acquire a new house in Mexico, the evidence suggests that Juan's father was the driving force in this regard rather than this couple. In contrast to Mrs. Feder's actions in Australia, Melissa seems to have done nothing in Mexico, beyond taking care of the children, that would indicate that she intended to stay.

23

To the contrary, she retained bank accounts and credit cards in the United States, and had her nursing license transferred and mail sent to Florida where her sister lived. Indeed, in the instant case, and unlike Feder, the district court made a finding of fact that the family was living in limbo during their stay in Mexico.

The facts of the instant case more closely resemble those in an Australian case. Director-General et al and M.S., No. SY8917 of 1997, Family Court of Australia at Sydney. There, the family moved to Austria after the father's father died and left him an ownership interest in the family house and business. The wife testified that the husband had assured her that it would only be for a short period, and if she did not like it, they would return. In preparation for their move, the wife packed most of their belongings and stored them in the basement of the house they owned, which they then rented out. The wife loaned her car to her nephew. The marriage was already deteriorating at the time they went to Austria and completely disintegrated there. Additionally, the wife's relationship with the husband's family and linguistic isolation deepened her unhappiness. After a year and a half, they instituted divorce proceedings but abandoned them because the husband did not want to disrupt the children. However, after returning from a visit to Australia a month later, the wife again filed for divorce, and during those proceedings, she testified that she intended to stay in Austria. After over a year's worth of

24

protracted proceedings in Austria, the wife took the children and returned to Australia.

The court found that habitual residency had not been established for the children in Austria. Examining the evidence, the court found that the mother never intended to stay permanently and viewed the move to Austria as a temporary measure. The court pointed to evidence that a year into the move, the wife became "hysterical" because she "realize[d] that she was trapped in Austria and that the husband had no intention of honoring the promise that was made at the time they left Australia." Opinion at 18. The court also looked at the fact that the family had left most of their belongings in the house that they owned in Australia. Finally, the court stated it was not persuaded that the parents ever formed a shared intention to remain in Austria and for it to be the children's permanent residence. Id. at 19.

There, as was the case here, the husband promised a conditional stay, i.e. one that could be terminated if it did not work out. Additionally, the extended period of time that the family stayed was not because the wife wanted to remain in Austria but because of the family's desire not to disrupt the children. That is similar to what happened here: Melissa returned in 2002, but only because Juan persuaded her to return and try to save the marriage. In other words, attempts to

25

salvage the marriage, rather than commitment to staying in the new locale are what determined the length of the stay in both cases.

In summary, we defer to the district court's finding of fact that the couple in the instant case did not have a shared, settled intention to abandon the previous United States habitual residence and take up residency in Mexico. Accepting that finding of fact, and taking into consideration all of the facts and circumstances of this case, including the objective factors noted above, our <u>de novo</u> review persuades us that the previous United States habitual residence of the children in the instant case has not been abandoned to take up a new habitual residency in Mexico. Accordingly, the judgment of the district court is

AFFIRMED.