In re the Application of Veronika
Elisabeth FALLS, Petitioner,

v.

Richard Thomas DOWNIE, Respondent.

Civ. A. No. 94–30293–MAP.

United States District Court,
D. Massachusetts.

Dec. 28, 1994.

Laura F. Arbeitman, Northampton, MA, for petitioner.

Leslie A. McLellan, Amherst, MA, for respondent.

## MEMORANDUM REGARDING PETITION FOR RETURN OF THE CHILD

PONSOR, District Judge.

### I. INTRODUCTION.

The petitioner Veronika Elisabeth Falls seeks an order from this court pursuant to the Hague Convention and the International Child Abduction Remedies Act (ICARA), 42 U.S.C. §§ 11601–11610, requiring the respondent Richard Thomas Downie to return their two-year-old child Patrick Falls to her. These cases are always difficult but this one, arriving as it did two days before Christmas, was especially painful.

The court heard testimony from both the mother and father on December 23, 1994 and rendered its decision orally. Findings of Fact are set forth below. In summary, the court has concluded that Patrick Falls was not a "habitual resident" of Germany at the time of the alleged wrongful retention by the father, respondent Downie. Given this, neither the Convention nor ICARA applies and this court lacks subject matter jurisdiction. The petition will therefore be denied and the court will order that this matter be dismissed.

### II. FINDINGS OF FACT.

Falls and Downie met each other in Germany when he was stationed there in the Army, and she was working as a cook at a United States Army base. The two began a relationship and in February 1992, Falls became pregnant. By that time, Downie and she were living together in her apartment, though he maintained a room at the base.

In the spring of 1992, the pair began building their own house on land given to Falls by her mother, and on November 11, 1992, the parties' son, Patrick, was born.

Downie had been separated from his American wife since August of 1990 and a divorce was pending in the United States. It was the parties' plan that, once the divorce was final, they would get married.

In March of 1993, Downie's period of enlistment expired and he left the military. For the balance of that year, Downie tried unsuccessfully to find work in Germany. The family's financial situation became dire. Falls was working full-time but needed between thirty-five and forty percent of her salary simply to pay the mortgage on the land and house they were building. The situation darkened further when Falls discovered that she was again pregnant in November of 1993.

At about this time, Falls and Downie decided that Downie should return to the United States and attempt to find work as a police officer in his home community in Western Massachusetts. He had previously worked as a police officer in Amherst. Just before Downie's departure, when the arrangements for Patrick's day care unexpectedly fell through, both parties agreed that Downie would take Patrick with him to the United States, where both he and the boy would live with his parents.

The decision by Falls to permit Downie to take Patrick to the United States was entirely voluntary. Moreover, Falls understood when Downie left with Patrick that he and their child would be staying in the United States for an *indefinite* period of time. Although the couple had not married, they considered themselves a family. The plan was that Falls would maintain close contact with Downie and her son over the next few months, then come to the United States in June of 1994 for her maternity leave after the birth of her child, marry Downie and begin residing indefinitely in the United States.

Following up on these plans, Downie left Germany in January of 1994 with Patrick and moved in with his parents in Amherst, Massachusetts. He was able to obtain part-time work as a police officer, but could not find a full-time job. Unfortunately, in February of 1994, Falls suffered a miscarriage. Despite this setback, she and Downie continued in a loving relationship for the next few months and sustained their hope that Downie would find full-time employment, and she would join him and Patrick in the United States. Because of the miscarriage, Falls lost the right to maternity leave and postponed the planned trip to the United States to August 1994.

In June of 1994, during a phone call Falls mentioned to Downie for the first time that she wished that Patrick could come back to Germany because she missed him very much. Downie stated that they should talk about it when she came to the United States in August.

Meanwhile, Patrick settled down in Amherst, Massachusetts, living at his grandparents' three-bedroom home. He was cared for by, and developed a close relationship with, his father. In addition, he developed a close relationship with his grandparents, who took care of him when his father was at work.

In August of 1994, Falls came to the United States and stayed with Downie and his parents in Amherst. It was clear that—for reasons that were not explored at the hearing—a shadow of some sort had fallen over the relationship. Despite this shadow, both parties still had hopes that they would eventually marry and make a family. Petitioner raised the issue of returning with Patrick to Germany several times during the August visit, but at this time the respondent Downie refused to permit Patrick to leave. His reason for this, as stated at the hearing, was that Patrick had become used to the environment in his grandparents' home, and he did not think the disruption of a removal to Germany was in the boy's best interest. At this point, due to the passage of time and the child's young age, Patrick barely knew his mother.

On August 30, 1994, Falls returned to Germany, leaving Patrick with Downie against her will. In Germany, she attempted to institute legal proceedings to obtain appropriate court orders giving her custody of Patrick. Delays occurred in this process. Eventually, she did obtain an order from the Police Court in Regensburg, Germany, hold-

ing that she was entitled to custody of Patrick. It is undisputed that under German law the mother has sole custodial rights over an illegitimate child.

Despite these legal developments, both parties testified that even as late as September 1994, following the return of Falls to Germany, they each clung to the hope that they would reunite as a family. As of the date of the hearing, December 23, 1994, both Falls and Downie appeared to have abandoned that hope. It is unclear at what point the relationship became irretrievable.

## III. DISCUSSION.

Although the facts of this case are somewhat tangled, the legal issue is simple. The Hague Convention is directed at undoing the *wrongful* removal or retention of a child. Under Article III of the Convention, the retention of a child is wrongful where (1) it is in breach of the rights of custody attributable to a person under the law of the state in which the child was a *habitual* resident immediately before the removal or retention, and (2) where the custody rights were being exercised by the petitioner.

■ A key prerequisite to exercise of jurisdiction under the Convention is that the child be removed or retained from its "habitual residence." *Ponath v. Ponath,* 829 F.Supp. 363, 365 (D.Utah, C.D.1993).

> To invoke the protection of the Convention, the taking or retention of a minor child must have occurred from a place where the child habitually resides.

*Meredith v. Meredith,* 759 F.Supp. 1432, 1436 (D.Ariz.1991).

The first time that the conduct of the respondent in this case could conceivably be characterized as "wrongful," would be in August of 1994 when Falls asked to take Patrick back to Germany and Downie refused to let him go. The petitioner bears the burden of proving by a preponderance of the evidence that Patrick *at that time* was a "habitual resident" of Germany.

This burden has simply not been carried. Courts have frequently noted in cases under this statute that the term "habitual residence" has never been defined either in the Convention itself or in the case law. *Ponath,* 829 F.Supp. at 365.

> In determining habitual residency, 'the court must look back in time, not forward ... future plans are irrelevant to our inquiry.' *Friedrich v. Friedrich,* 983 F.2d 1396, 1401 (6th Cir.1993). 'To determine the habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions.' *Friedrich,* at 1401.

*Slagenweit v. Slagenweit,* 841 F.Supp. 264, 268 (N.D.Iowa 1993). What is required is that there be a "degree of settled purpose." *Id.* at 268, quoting *In re Bates,* No. CA 122.2–89 High Court of Justice, Family Division Court, Royal Court of Justice, United Kingdom 1989.

In this case, as of August 1994, this twenty-one-month old boy had been living in the United States, with the agreement of his mother, and with the prospect of an indefinite continuance of residence, for eight months. He had become completely accustomed to life in this country with his father and grandparents; he barely knew his mother. It simply defies common sense to suggest under these circumstances that Patrick was, as of that date, a "habitual" resident of Germany. In every significant respect, the boy had by August 1994 settled with the consent of his mother indefinitely in this country.

This conclusion ends the discussion with regard to the application of the Hague Convention and ICARA. To say there was no wrongful retention, of course says nothing about the ultimate issue of custody. This court's decision simply signifies that a competent court of the Commonwealth of Massachusetts will be making the judgment with regard to custody. The child is not subject to immediate return to Germany under the terms of the Convention.

## IV. CONCLUSION.

For the foregoing reasons, the Petition For Return of the Child is hereby DENIED

and this matter is DISMISSED for lack of subject matter jurisdiction.