**Jeremiah W. HOLDER, Petitioner–Appellant,**

v.

**Carla R. HOLDER, Respondent–Appellee.**

No. 03–35595.

United States Court of Appeals, Ninth Circuit.

Submitted Dec. 6, 2004.*

Filed Dec. 9, 2004.

---

* Jeremiah Holder filed a motion to submit the case on the briefs and without oral argument. The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

Jeremiah W. Holder, pro se, Darmstadt, Germany, appellant.

A. Chad Allred, Ellis, Li & McKinstry PLLC, Seattle, WA, for the appellee.

Before: HAWKINS, THOMAS, and McKEOWN, Circuit Judges.

McKEOWN, Circuit Judge:

We consider here a matter of first impression under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, 19 I.L.M. 1501 (the "Convention"), namely whether a family's short-term residence on an American military base in Germany renders Germany the children's habitual residence. Jeremiah Holder appeals from the district court's order dismissing his petition for the return of his children to Germany under the Convention.

This case presents a somewhat unusual set of facts. Jeremiah was stationed at Sembach Air Force Base in Germany. He was accompanied by his wife, Carla, and their two children. The Holders were in Germany for only eight months in 1999 and early 2000 before Carla returned to the United States with the children. Soon after Carla's return, Jeremiah filed for divorce and filed a petition under the Convention in federal court alleging that Carla had wrongfully retained the children.

Jeremiah visited the children in the United States and, in violation of a California court order, took the children back to Germany in early 2002. Ultimately, he agreed to return the children to Carla in Seattle. Jeremiah pled nolo contendere to a misdemeanor charge and is prohibited from seeing or talking with the children until 2005 without further court order. Although Jeremiah later moved temporarily to the Seattle area, he has now returned to Germany.

Despite this crisscrossing of the Atlantic, the case boils down to whether Jeremi-

ah sustained his burden to establish that Germany was the children's habitual residence immediately prior to their mother's alleged wrongful retention. Because Jeremiah failed to carry his burden on the habitual residence issue, a threshold determination under the Convention, we affirm the district court's order.[1]

## BACKGROUND

Carla and Jeremiah Holder were married in California. Their two sons were born there in 1994 and 1999. Jeremiah entered the United States Air Force after their first son was born. The family lived in Texas while Jeremiah attended training and returned to California briefly before leaving for overseas duty in Japan in 1995. Despite initial plans to stay in Japan for three years, the family returned to California in 1997 on a humanitarian transfer because of an illness in the extended family. For the next two years, the family lived on Travis Air Force Base in California.

Shortly after the birth of their second child in July 1999, the family moved to Sembach Air Force Base in Germany where Jeremiah had been posted on a four-year assignment. Prior to moving, Jeremiah reenlisted for six years, apparently in order to receive a bonus being offered in his specialty. Carla and the two boys joined Jeremiah in Germany around September 1, 1999. The military transported the family's household goods and vehicle to Germany and provided housing on the base. The older son attended kindergarten on the base, and Carla cared for the baby at home.

Jeremiah and Carla participated in marriage counseling prior to the move, but their marital problems grew more severe while in Germany. Carla and the children left Germany in May 2000—approximately eight months after their arrival—and flew to her parents' home in Washington. The parties dispute whether the trip was intended as a six-week vacation or an indefinite stay. Carla did not return to Germany with the children, and they currently reside with her in Washington.

Jeremiah initiated divorce and custody proceedings in California in June 2000 and filed the current petition under the Convention in federal district court in Washington the following November. The divorce became final in June 2001. Meanwhile, the custody and Convention petition proceedings moved forward in the California and federal courts on parallel tracks.

The district court initially referred Jeremiah's petition to a magistrate judge, who recommended that the district court stay proceedings under the *Colorado River* doctrine. *See Intel Corp. v. Advanced Micro Devices*, 12 F.3d 908, 912 (9th Cir.1993) ("Considerations of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation' may counsel granting a stay when there are concurrent state proceedings involving the same matter as in the federal district court.") (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). After reviewing the record, the district court adopted the magistrate judge's report and recommendation (the "First Report and Recommendation") and stayed the Convention proceedings pending resolution of the California appellate proceedings regarding custody. Jeremiah appealed the stay to our court.

In the prior appeal, we vacated the district court's ruling staying the proceedings

---

**1.** Jeremiah's challenge to the district court's award of costs to Carla is moot as he has not prevailed in either the district court or this court.

and remanded the case for consideration of the petition's merits, including whether Germany was the children's habitual residence for purposes of the Convention. *See Holder v. Holder*, 305 F.3d 854, 873 (9th Cir.2002) ("We do not reach any of the parties' arguments that bear on the merits of Jeremiah's petition. . . . These should be resolved by the district court in the first instance."). In addition, we vacated the district court's denial of Carla's request for attorney's fees and costs on the ground that a decision on this issue was premature.[2] *Id.* at 874.

Following remand, the district court directed the magistrate judge to determine the merits of the petition. After a three-day evidentiary hearing in 2003, the magistrate judge issued a thorough and detailed report and recommendation (the "Second Report and Recommendation"). Jeremiah filed two sets of objections—one through his attorney and, because of a conflict with his attorney, a second set of objections he prepared himself.[3] The district court considered de novo both sets of objections, adopted the Second Report and Recommendation, and denied Jeremiah's petition on the ground that he had "not carried his burden of showing that Germany was the children's habitual residence." This second appeal followed.

## DISCUSSION

■ The Convention text provides that one of its primary objects is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State." Convention, art. 1, 19 I.L.M. at 1501. Underlying this aim is the premise that the Convention should deprive parties of any tactical advantages gained by absconding with a child to a more favorable forum. *See* Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed.Reg. 10,494, 10,504 (Dep't of State Mar. 26, 1986) ("A fundamental purpose of the Hague Convention is to protect children from wrongful international removals or retentions by persons bent on obtaining their physical and/or legal custody.").

As explained by the official history and commentary, the Convention is intended to prevent "the use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child." Elisa Pérez–Vera, Explanatory Report ¶ 11, *in* 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426 (1982) (hereinafter Pérez–Vera Report).

The Convention's focus is thus *whether* a child should be returned to a country for custody proceedings and not *what* the outcome of those proceedings should be. *See* Convention, art. 19, 19 I.L.M. at 1503 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any

**2.** Jeremiah contends that "this court remanded the case with the instruction that the District Court has the power to vacate any court orders in violation of the automatic stay provisions of the [Convention]." Although we recognized that "federal courts must have the power to vacate state custody determinations and other state court orders that contravene the [Convention,]" *Holder*, 305 F.3d at 865 (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1085 n. 55 (9th Cir.2001)), we did not specifically instruct the district court to stay any court proceedings in this case.

**3.** A similar sequence occurred on appeal. Jeremiah filed an informal opening brief. Pro bono counsel appointed by the court filed a second opening brief. Due to a conflict between counsel and Jeremiah, we granted counsel's motion to withdraw. We have considered the briefs filed by both counsel and Jeremiah.

custody issue."); *see also* Linda Silberman, *Patching Up the Abduction Convention: A Call for a New International Protocol and a Suggestion for Amendments to ICARA*, 38 Tex. Int'l L.J. 41, 44 (2003) ("The Convention remedy can best be thought of as a 'provisional' remedy because it does nothing to dispose of the merits of the custody case.").

As a threshold issue, the duty to return a child arises only if the removal or retention was "wrongful":

> The removal or the retention of a child is to be considered wrongful where—
> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was *habitually resident* immediately before the removal or retention; and
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, art. 3, 19 I.L.M. at 1501 (emphasis added).

Here, the crux of the issue is whether the children's habitual residence was Germany immediately prior to the alleged wrongful retention.[4] If the children's habitual residence was the United States, then the Convention would not compel the children's return to Germany because they were neither "removed" from the state of habitual residence nor "retained" in another state.[5] *See* Pérez–Vera Report, *supra*, ¶ 58 (clarifying that the scope of the Convention is limited "to those children who, while being habitually resident in one of the Contracting States, are removed to or retained in, the territory of another Contracting State").[6] On the other hand, if Germany were the habitual residence, then

4. Jeremiah maintains that the district court failed to find "where the children's habitual residence was immediately prior to Carla taking them from Germany." The record demonstrates, however, that the district court concluded that the children's habitual residence was the United States. The Second Report and Recommendation, which was adopted wholesale by the district court, states that "the family's translocation to Germany from the *established habitual residence of the United States* was clearly intended to be for a specific, delimited period of four years" and "it is sufficient to identify the *United States as the habitual residence of the children*" (emphasis added). On review, the district court noted the recommendation that the children's habitual residence "was California, not Germany" and found that Jeremiah had not carried his burden of showing that "by the time of the children's removal, Germany had become their habitual residence."

5. The date that the alleged wrongful retention began is a bit murky. Jeremiah does not dispute that Carla had his permission to remove the children from Germany in order to *visit* the United States. The Second Report and Recommendation states that the wrongful retention began on June 27, 2000, when Jere-

miah filed for divorce and sole custody of the children. Jeremiah presents several options for the date of wrongful removal or retention: (1) May 5, 2000, if Carla left with the intention of not returning with the children to Germany; (2) May 8, 2000, when she told Jeremiah she would not return with the children; or (3) June 19, 2000, when she failed to return the children to Germany in accordance with the purchased round-trip airplane tickets. The exact date is immaterial, however, to our analysis. It is sufficient to note that the alleged wrongful retention began by the end of June 2000. This date precedes Jeremiah's commencement of these proceedings under the Convention.

6. Germany and the United States are both signatories to the Convention. *See* Hague Conference on Private International Law: Report of the Second Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction, 33 I.L.M. 225, 225 (1994) (hereinafter Second Special Commission Report). The United States became a party on July 1, 1988, *see* Exec. Order No. 12,648, 53 Fed.Reg. 30,637 (1988), and Congress subsequently enacted the International Child Abduction Remedies Act, 42 U.S.C.

the protections of the Convention would kick in and the children would be returned to Germany.

The term "habitual residence" was intentionally left undefined in the Convention. *Id.* ¶ 53; *cf.* Paul Lagarde, Explanatory Report ¶ 40, *in* 2 Hague Conference on Private International Law, Proceedings of the Eighteenth Session 534 (1996) (reporting in the context of the 1996 Hague Child Protection Convention that a proposal to insert a definition of habitual residence "went against the Conference's tradition and received no support"). This omission has helped courts avoid formalistic determinations but also has caused considerable confusion as to how courts should interpret "habitual residence."

■ In hopes of providing "intelligibility and consistency" in the determination of children's habitual residences, we set out an analytical framework in *Mozes v. Mozes,* 239 F.3d 1067, 1071–73 (9th Cir. 2001). First, in order to acquire a new habitual residence, there must be a "settled intention to abandon the one left behind." *Id.* at 1075. This is a question of fact to which this court grants deference to the district court. *Id.* at 1075–76. Second, there must be (A) an "actual 'change in geography,' " *id.* at 1078 (quoting *Friedrich v. Friedrich,* 983 F.2d 1396, 1402 (6th Cir.1993)), combined with (B) the "passage of 'an appreciable period of time.' " *Mozes,* 239 F.3d at 1078 (quoting *C v. S,* 2 Eng. Rep. 961, 965 (Eng.H.L.1990)). This period of time must be "sufficient for acclimatization." *Mozes,* 239 F.3d at 1078 (quoting *Feder v. Evans–Feder,* 63 F.3d 217, 224 (3rd Cir.1995)).

In applying this framework, we are keenly aware of the flexible, fact-specific nature of the habitual residence inquiry envisioned by the Convention. *See* Paul R. Beaumont & Peter E. McEleavy, *The*

*Hague Convention on International Child Abduction* 89 (1999) ("The strength of habitual residence in the context of family law is derived from the flexibility it has to respond to the demands of a modern, mobile society.... To preserve this versatility the Hague Conference has continually declined to countenance the incorporation of a definition.") (footnotes omitted). We recognized in *Mozes* that the Hague Conference has termed the concept of habitual residence "a question of pure fact, differing in that respect from domicile." 239 F.3d at 1071 (quoting Pérez–Vera Report, *supra,* ¶ 66); *see also C v. S,* 2 Eng. Rep. at 965 ("[T]he question whether a person is or is not habitually resident in a specified country is a question of fact to be decided by reference to all the circumstances of any particular case."); 42 U.S.C. § 11601(b)(3)(B) (declaring Congress's recognition of "the need for uniform international interpretation of the Convention").

■ Despite the factual focus of our inquiry, ultimately our conclusion rests on a legal determination: After scrutinizing the circumstances of a particular case, we must determine whether the discrete facts add up to a showing of habitual residence. The habitual residence analysis is thus a mixed question of fact and law, *see Mozes,* 239 F.3d at 1073, under which we review "essentially factual" questions for clear error and the ultimate issue of habitual residency de novo. *Id.; see also Ruiz v. Tenorio,* No. 03–14850, 392 F.3d 1247, 1251, 2004 WL 2796553, at *3 (11th Cir. Dec.7, 2004) (joining the Ninth Circuit and other circuits in adopting a mixed standard of review when determining habitual residence). In making this determination, we heed the statutory requirement that Jeremiah—as the party seeking return of the children—establish by a preponderance of the evidence that the children have been

§§ 11601–11610, to implement the Conven-    tion.

wrongfully retained. *See* 42 U.S.C. § 11603(e)(1).

We emphasize that courts must consider the unique circumstances of each case when inquiring into a child's habitual residence. Thus, for example, no per se rule dictates that children of U.S. military personnel remain habitually resident in the United States when joining their parents at overseas posts. To the contrary, fact patterns vary considerably within the limited universe of Convention cases involving military personnel. For example, in *Shealy v. Shealy*, 295 F.3d 1117, 1119 (10th Cir.2002), an American couple had a child in the United States prior to moving to Germany with the U.S. Army. Over three years later, the mother began divorce proceedings in Germany and then suddenly left for the United States with the child, at which point she dismissed the German proceedings and filed for divorce in Alabama. *Id.* at 1119–20. The district court determined that the child was habitually resident in Germany, and the mother did not appeal this finding. *Id.* at 1122.

The fact-based determination of the inquiry is illustrated by *Falls v. Downie*, 871 F.Supp. 100 (D.Mass.1994). In *Falls*, a couple met on an Army base in Germany and had a child together there. *Id.* at 100. After the father failed to find work in Germany when his period of enlistment expired, he returned to the United States with the couple's one-year-old child. *Id.* at 101. The mother remained behind in Germany. *Id.* The district court found that the timing and circumstances were such that the child's habitual residence had shifted to the United States at the time of the alleged wrongful retention. *See id.* at 102.

The Sixth Circuit considered yet another case centered on Germany. In *Friedrich*,

an American stationed in Germany with the Army had a child with a German citizen. 983 F.2d at 1398. The couple lived off of the military base in Germany until the child was approximately one and a half years old, at which time the mother took the child with her to the United States. *Id.* at 1398–99. The Sixth Circuit held that the child was a habitual resident of Germany at the time of his removal. *Id.* at 1402. These cases underscore that military families do not generate a typical fact pattern and, in all Convention cases, emphasis is on the details of the case at hand.

## I. SETTLED INTENTION

■ We turn first to the question of whether the Holders had a settled intention to abandon the United States as the children's habitual residence in favor of Germany. To resolve this question, under the circumstances of this case, we look to the subjective intent of the parents, not the children. *Mozes*, 239 F.3d at 1076–78.

■ Upon leaving the United States, the Holders were committed to a four-year tour of duty in Germany. Carla emphasized her intent not to abandon the United States as the family's habitual residence, testifying that she expected that the family would stay in Germany for four years, "[j]ust to fulfill [Jeremiah's] assignment for the military." In contrast, Jeremiah maintains that he considered the move more permanent, that he had "reupped" his military obligation for six years in connection with the move to Germany, and that the couple had discussed the possibility of an extension of the obligation.

In analyzing Carla's and Jeremiah's intent, we do not lose sight of the fundamental inquiry: the *children's* habitual residence.[7] Parental intent acts as a sur-

---

7. At a meeting attended by representatives of fifty-four countries held over a decade after the adoption of the Convention, the participants raised the issue of military personnel stationed abroad who "were sometimes held not to have established residence in these places, as they had come there because of

rogate for that of children who have not yet reached a stage in their development where they are deemed capable of making autonomous decisions as to their residence. *Id.* at 1076 (explaining that because children "normally lack the material and psychological wherewithal to decide where they will reside[,] . . . 'the intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence' ") (quoting E.M. Clive, *The Concept of Habitual Residence,* 1997 Jurid. Rev. 137, 144) (footnotes omitted).

That children will not indefinitely bend to their parents' wishes is recognized by the limitation that the Convention applies only to children under the age of sixteen. *See* Convention, art. 4, 19 I.L.M. at 1501; *see also* Pérez–Vera Report, *supra,* ¶ 77 ("The reason for [the age limit] derives from the objects of the Convention themselves; indeed, a person of more than sixteen years of age generally has a mind of his own which cannot easily be ignored either by one or both of his parents, or by a judicial or administrative authority."). The Convention even allows for judicial authorities to refuse to return children under the age of sixteen "if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Convention, art. 13, 19 I.L.M. at 1502; *see also* Pérez–Vera Report, *supra,* ¶ 30 ("[T]he fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will."). Considering that the Holders' older son had barely finished kindergarten at the time Jeremiah commenced this peti-

tion, we see no sound reason to invoke this provision.

With parental intent as the starting point, the question then becomes how, given the parties' conflicting views on their intentions at the time the family moved to Germany, the district court should have evaluated Jeremiah's and Carla's intentions. We have recognized that when the parents no longer agree on where the children's habitual residence has been fixed, we must look beyond the representations of the parties and consider "all available evidence." *Mozes,* 239 F.3d at 1076.

In reaching its conclusion that "[s]ubstantial evidence shows that the Holders did not consider Germany to be their settled home," the district court pointed in part to Jeremiah's sworn statement in the virtually simultaneous California litigation that the United States was his permanent residence. In addition, the district court noted that the document changing Jeremiah's military station stated the "tour length" as "a very definite 48 months." That the Holders had previously left for a several-year tour of duty in Japan and had returned to the United States two years later bolsters the inference that their stay in Germany was but another temporary assignment that was part of Jeremiah's military duties.

The cases under the Convention tend to break down along a continuum:

> On one side are cases where the court finds that the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move. Most commonly, this occurs when both parents and the child translocate together under circumstances sug-

---

military orders." Second Special Commission Report, *supra,* at 234. Unfortunately for our analysis, the report does not shed much light on how to assess these situations; it

notes only that "the habitual residence in question under the Convention is always only the habitual residence of the child, not that of the parent." *Id.*

gesting that they intend to make their home in the new country. When courts find that a family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another, they are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled purpose.

*Id.* at 1076–77 (footnotes omitted). On the other end of the spectrum "are cases where the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period. In these cases, courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." *Id.* at 1077. In the middle rest cases where a parent "had earlier consented to let the child stay abroad for some period of ambiguous duration." *Id.* The Holders' case presents yet another marker on the continuum.

This case falls closer to the end of the continuum marked by moves for "specific, delimited" periods of time, *id.*, such as sabbaticals and other conditional stays. *See, e.g., Ruiz,* 392 F.3d at 1259, 2004 WL 2796553, at *11 (deferring to district court's finding that there was no shared intention to abandon the prior United States habitual residence based on the conditional nature of the move to Mexico); *Tsarbopoulos v. Tsarbopoulos,* 176 F.Supp.2d 1045, 1055–56 (E.D.Wash.2001) (finding "no objective evidence contradicted the notion that the move to Greece was only for a [two-year] sabbatical" and concluding that the "couple did not share an intent to make Greece the [family's] habitual residence"); *In re Morris,* 55 F.Supp.2d 1156, 1162 (D.Colo.1999) (concluding that "the parties' shared intention was to remain in Switzerland for a limited period of time defined by the Father's sabbatical leave").

The conditional move to Germany stands in contrast to situations in which the family definitively left the old residence and reestablished residence in a new location. *See, e.g., Silverman v. Silverman,* 338 F.3d 886, 898 (8th Cir.2003) (citing the moving of personal possessions and selling of the family's house as two factors indicating a change of habitual residence); *Feder,* 63 F.3d at 224 (holding that the children's habitual residence was Australia based on, *inter alia,* sale of the family's house in the United States, shipment of the family's belongings to Australia, and purchase of a house there); *see also Clive, supra,* at 142 ("A person who has sold house and furniture and set off for a new life in another country would not be using words normally if he or she claimed to be still habitually resident in the old country."). In these cases, our sister circuits have found a settled intention to acquire a new habitual residence based in part on the shipment of family possessions to the new location coupled with a failure to maintain a residence in the former location. We do not view these factors as dispositive of Jeremiah's and Carla's intent considering that, as is customary, the military transported their belongings, thereby providing an incentive to move all possessions. The Holders' failure to maintain a residence in the United States is also not surprising given that they were living on a military base.

We acknowledge that this is a close case. The move to Germany was no mere vacation. The Holders' stay might have been "intended to be of a specific, delimited period," *Mozes,* 239 F.3d at 1077, but it was for a period of four years. Mindful of our caution in *Mozes* that being "settled" somewhere "need not mean that's where you plan to leave your bones," *id.* at 1074, our review of the evidence persuades us that the district court did not err in finding that Jeremiah and Carla lacked a shared intention to abandon the United States as

the children's habitual residence and shift it to Germany. *See id.* at 1084 (noting that the district court gave "insufficient weight to the importance of shared parental intent" and instructing that "the appropriate inquiry under the Convention is whether the United States had supplanted Israel as the locus of the children's family and social development").

## II. ACCLIMATIZATION

■ Having determined that the Holders did not share a settled intention to adopt Germany as their children's habitual residence, we consider whether the children had acclimatized to life in Germany. Although it is possible for a child's contacts standing alone to be sufficient for a change in habitual residence, in view of "the absence of settled parental intent, [we] should be slow to infer from such contacts that an earlier habitual residence has been abandoned." *Id.* at 1079.

Physical presence on German soil is not, as Jeremiah argues, sufficient for a change in habitual residence. *See* Clive, *supra,* at 139 (" 'Residence' is not the same as physical presence."). Rather, an actual change in geography is only one factor in the determination. The analysis also includes intangible factors for, at heart, the Convention is concerned with the situation where "the child is taken out of the family and social environment in which its life has developed." Pérez–Vera Report, *supra,* ¶ 11.

In determining whether a child's life has become embedded in a new country, we caution that "acclimatization" should not be confused with "acculturation." *But see* Beaumont & McEleavy, *supra,* at 90 ("If a child does not have a factual connection to a State and knows nothing of it socially, culturally, and linguistically, there will be little benefit in sending him there."). As Jeremiah incisively asks in his brief, "What would be the preponderance of the evidence standard for proving 'acclimatization'? Would the children have to be wearing liederhosen and speaking Deutsche?"

The Convention does not direct a court to decide whether the children were acclimatized to a country, such as Germany, on the basis of whether they can count to ten in German or whether they prefer *gummibaeren* to Hershey bars. Instead, the inquiry is, more generally, whether the children's lives have become firmly rooted in their new surroundings.[8] Simply put, would returning the children to Germany be tantamount to sending them home?[9] In answering this question, we discuss the children separately because the five-year age gap between the two boys is relevant to the acclimatization analysis.

---

8. We note that the district court placed considerable emphasis on the cultural aspects of the children's interactions with their new surroundings. Admittedly, when a child is living in an American enclave, albeit on German soil, the concepts of acclimatization and acculturation overlap. As the district court explained, "[The older son] did not acclimatize to German life because he spent the vast majority of his time (including his schooling) on the base. This was likely to slow his acclimatization to Germany ... because nearly everyone with whom [he] interacted was American ...." Nonetheless, the concepts are not interchangeable in the context of the Convention.

9. Beaumont and McEleavy provide the following explanation of the Convention's goals:

> [T]o ensure that a return will be in children's interests, ... greater care should be taken that there is a real and substantial connection between a child and his place of habitual residence; which is the usual place to which a return order should be made. This will not only mean in the short term that the child is 'going home', but it will confirm the designation of that jurisdiction as the *forum conveniens* for any subsequent merits hearing.

Beaumont & McEleavy, *supra,* at 263.

The older son was in the process of transitioning his life to Germany: He attended kindergarten, participated in sports programs, and accompanied his parents on various excursions both on and off the base.[10] We nonetheless heed this court's admonition that while "[c]hildren can be remarkably adaptable[,] ... [i]t is quite possible to participate in all the activities of daily life while still retaining awareness that one has another life to go back to." *Mozes*, 239 F.3d at 1079. "It thus makes sense to regard the intentions of the parents as affecting the length of time necessary for a child to become habitually resident, because the child's knowledge of these intentions is likely to color its attitude toward the contacts it is making." *Id.* at 1079–80 (footnotes omitted).

We cannot conclude that the older son's mere eight months in Germany were sufficient to overcome the lack of shared parental intent to abandon the United States as the children's habitual residence. *Cf. Shalit v. Coppe*, 182 F.3d 1124, 1128 n. 5 (9th Cir.1999) (noting, without deciding habitual residence, that "[t]hree years is certainly enough time for [the child] to be considered 'settled' in Israel, regardless of [the mother's] claimed intention to have him return permanently to Alaska at some point in the future.").

The younger son's youth adds a twist to the analysis. When and how does a newborn child acquire a habitual residence? The place of birth is not automatically the child's habitual residence. *See Delvoye v. Lee*, 329 F.3d 330, 334 (3rd Cir.), *cert. denied*, 540 U.S. 967, 124 S.Ct. 436, 157 L.Ed.2d 312 (2003) (holding that a child born in Belgium was nonetheless habitually resident in the United States because the mother "traveled to Belgium to avoid the cost of the birth of the child and intended to live there only temporarily"); *see also Beaumont & McEleavy, supra*, at 112 (suggesting that, at times, a child may be without a habitual residence because "if an attachment [to a State] does not exist, it should hardly be invented").

Nonetheless, if a child is born where the parents have their habitual residence, the child normally should be regarded as a habitual resident of that country. *See* Clive, *supra*, at 146; *see also Cooper v. Casey* (1995) 18 Fam. L.R. 433 (Austl.) (citing favorably Australian precedent that "[t]he habitual residence of the young children of parents who are living together is the same as the habitual residence of the parents themselves and neither parent can change it without the express of tacit consent of the other or an order of the court"). These circumstances clearly apply to the younger son: He was born in California while both of his parents were habitual residents of the United States.[11]

Once this initial habitual residence has been established, we recognize that it is practically impossible for a newborn child, who is entirely dependent on its parents, to acclimatize independent of the immedi-

---

10. We note that the Air Force Base on which the Holders lived was on German territory. *Cf. Friedrich*, 983 F.2d at 1401 ("The military base in Bad Aibling is on land which belongs to Germany and which the United States Armed Services occupy only at the pleasure of the German government."). We thus leave for another day the question of how the analysis would play out if a child lived in an area deemed to be U.S. soil and under U.S. sovereignty.

11. In *B v. H*, 1 Fam. L.R. 389 (Eng.2002), an English court was faced with determining the habitual residence of a child who was conceived in England but born in Bangladesh. The court explained that "like the habitual residence of infants[,] the habitual residence of a new born baby is determined by the position of the parents who have parental responsibility for him and care and control of him." As the court emphasized, "It is the settled intentions of the parents that render that 'residence' of the baby habitual." *Id.*

ate home environment of the parents. We decline to delineate whether there are circumstances under which an infant can acquire a new habitual residence in the absence of shared parental intent. It is sufficient for the present case to conclude that Jeremiah has not established that the infant's limited time in Germany so firmly embedded his life there that his habitual residence shifted overseas despite the lack of shared parental intent. *Cf. In re Ponath*, 829 F.Supp. 363, 367 (D.Utah 1993) ("Although it is the habitual residence of the child that must be determined, the desires and actions of the parents cannot be ignored by the court in making that determination when the child was at the time of removal or retention an infant.").

Simply stated, neither child had developed deep-rooted ties to the family's new location. This conclusion comports with the spirit of the Convention, which aims "to secure the immediate reintegration of the child into its habitual environment." Pérez–Vera Report, *supra*, ¶ 25.

In reaching this conclusion, we emphasize that cultural attachments are not the *sine qua non* of a habitual residence determination: Attending Oktoberfest does not make one a habitual resident of Germany. Conversely, a child whose parents intended to resettle in the United States and who spends a decade living in San Francisco's Chinatown would undeniably be habitually resident in the United States even if she had never watched a baseball game or had a slice of apple pie. Indeed, if cultural ties were held paramount, then countless expatriate children around the globe would already have satisfied a significant component of the requirements for becoming habitual residents of the United States based on an affinity for McDonalds, Mickey Mouse, and Michael Jordan. Therefore, our conclusion that the Holder children were not habitual residents of Germany is

not driven by the fact that they did not, to quote Jeremiah, "wear liederhosen."

In sum, in light of the parents' failure to share a settled intention to abandon the United States as the children's habitual residence and the children's lack of acclimatization to the family's new location, the district court did not err in concluding that the children's habitual residence remained the United States throughout their time in Germany. Carla's retention of the children was therefore not wrongful under the Convention.

## III. EVIDENTIARY HEARING BY THE MAGISTRATE JUDGE

■ Finally, we consider Jeremiah's objections to the magistrate judge's involvement in the proceedings. Following the issuance of the Second Report and Recommendation, Jeremiah objected to the district court's referral of the petition to the magistrate judge. Jeremiah did not object to the use of a magistrate judge in his objections to the First Report and Recommendation. However, in his objections to the Second Report and Recommendation, Jeremiah distinguished the second round of hearings on the basis that the "mandate of the Ninth Circuit to [the district court] was for an 'expeditious adjudication' 'under the provisions of the Hague Convention.' " *See Holder*, 305 F.3d at 860 ("[W]e vacate the district court's order staying proceedings pending the outcome of Jeremiah's state court appeal and remand for expeditious adjudication of his Hague Convention claim . . . ."). His complaint is that the district court should have conducted the evidentiary hearing, not the magistrate judge, and that the hearing should have been accomplished in a more expeditious fashion.

The district court's invocation of the magistrate judge's assistance was firmly rooted in statutory authority. Congress

has granted district courts the authority to "designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court." 28 U.S.C. § 636(b)(1)(B); *see also* Fed. R.Civ.P. 72(b) ("[T]he magistrate judge shall enter into the record a recommendation for disposition of the matter, including proposed findings of fact when appropriate."). No consent is required in these circumstances.

Here, following the receipt of the parties' objections to the Second Report and Recommendation, the district court made "a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made" as required by statute. 28 U.S.C. § 636(b)(1)(C); *see also United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("[I]n providing for a 'de novo determination' rather than *de novo* hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations.").

The district court expressly stated in its order that it adopted the magistrate judge's recommendations only after having undertaken a de novo review of the record, the Second Report and Recommendation, Jeremiah's objections, and Carla's responses. *See McKeever v. Block,* 932 F.2d 795, 798 (9th Cir.1991) ("[W]ith respect to dispositive matters, a magistrate is only permitted to make recommendations for final disposition by an Article III judge who reviews his findings and recommendation, if objected to, de novo.").[12] The district court's approach fully complied with the statutory requirements in using the magistrate judge's assistance in this case.

Jeremiah further objected to the referral to the magistrate judge on the ground that a petition under the Convention is to be handled under the "most expeditious procedures available." Convention, art. 2, 19 I.L.M. at 1501. This objection is ironic in that the district court determined that using a magistrate judge "would best expedite resolution of this matter" considering that "it was clear that [the magistrate judge's] schedule could accommodate the hearing more quickly." *See* Pérez–Vera Report, *supra,* ¶ 63 (explaining that the Convention "does not impose an obligation

12. Jeremiah contends that the district court exceeded the bounds of delegable authority by ordering the magistrate judge to "hear and determine the petition and motions." The district court initially cited the statutory provision for nondispositive matters when, in fact, the determination of the petition would decide the entire case. *Compare* Fed.R.Civ.P. 72(a) ("A magistrate judge to whom a pretrial matter not dispositive of a claim or defense of a party is referred to hear and determine shall promptly conduct such proceedings as are required ....") *with* Fed.R.Civ.P. 72(b) ("A magistrate judge assigned without consent of the parties to hear a pretrial matter dispositive of a claim or defense of a party ... shall promptly conduct such proceedings as are required.... The magistrate judge shall enter into the record a recommendation for disposition of the matter, including proposed findings of fact when appropriate."). In a Minute Order issued prior to the evidentiary hearing in 2003, the district court noted Jeremiah's objection and clarified that its prior order authorized the magistrate judge "to conduct the evidentiary hearing without the consent of the parties," and the district court "would undertake a *de novo* review of the Report and Recommendation and make a final determination on the merits of the petition." In the end, the magistrate judge did not *determine* the petition, but rather he conducted an evidentiary hearing and submitted his report and recommendation to the district court for its de novo review as required for dispositive matters. The verbiage in the district court's initial order, albeit a miscitation, did not result in the magistrate judge overstepping his statutory authority.

upon States to bring new procedures into their internal law" but rather requests that States "use the most expeditious procedures available in their own law"). Surely we cannot second-guess the congestion level of the court, nor do we think Jeremiah is in a position to do so.

These proceedings have far exceeded the Convention's aspirational "non-obligatory time-limit of six weeks" for courts to reach a decision after the commencement of proceedings. Pérez–Vera Report, *supra,* ¶ 105; *see also* Convention, art. 11, 19 I.L.M. at 1502 ("If the judicial or administrative authority concerned has not reached a decision within six weeks from the date of commencement of the proceedings, the applicant or the Central Authority of the requested State ... shall have the right to request a statement of the reasons for the delay."). The years that have elapsed since Jeremiah first brought his petition are especially long judged from the perspective of a young child. The district court was sensitive to these considerations, emphasizing that a "speedy resolution is particularly important here given the regrettable delays that have already taken place." Bearing these concerns in mind, the district court recognized the delay that would occur because of its docket and invoked the help of a magistrate judge, a legitimate means of moving the proceedings through an overburdened court system. *See Peretz v. United States,* 501 U.S. 923, 930, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991) ("Given the bloated dockets that district courts have now come to expect as ordinary, the role of the magistrate in today's federal judicial system is nothing less than indispensable.") (quoting *Government of the Virgin Islands v. Williams,* 892 F.2d 305, 308 (3rd Cir. 1989)).

We observe that the district court here was not alone in turning to a magistrate judge to facilitate the proceedings. Other courts have similarly looked to magistrate judges in handling Convention petitions. *See, e.g., Bekier v. Bekier,* 248 F.3d 1051, 1054 (11th Cir.2001) (noting district court's adoption of the magistrate judge's report in granting a petition for the return of a child under the Convention); *Gonzalez Locicero v. Nazor Lurashi,* 321 F.Supp.2d 295, 296 (D.P.R.2004) (citing statutory power to refer matters to a magistrate judge in order granting petitioner's request for return of a child under the Convention).

The Convention imposes a double duty of "the use of the most speedy procedures known to [a State's] legal system" and "that applications are, so far as possible, to be granted priority treatment." Pérez–Vera Report, *supra,* ¶ 104. While we underscore the importance of district courts adjudicating Convention petitions expeditiously, we empathize with the difficulty in reaching speedy, yet thorough, decisions in the face of severely strained judicial resources. For now, we urge courts to give docket priority to Convention petitions and to seek means of expediting the petitions to the extent possible and practicable. These cases are always heart-wrenching, and there is inevitably one party who is crushed by the outcome. We cannot alleviate the parties' emotional trauma, but at a minimum we can hope to provide them and their children with a prompt resolution so that they can escape legal limbo. Although circumstances do not always permit an instantaneous decision, we are particularly sensitive to the delay in this case and have thus expedited this opinion.[13]

---

**13.** This case was submitted on December 6, 2004. The decision was filed three days later on December 9, 2004.

We **AFFIRM** the district court's order dismissing Jeremiah's petition.