In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-2511

DEREK REDMOND,

*Petitioner-Appellee,*

*v.*

MARY REDMOND,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 11 C 8542—**Charles R. Norgle**, *Judge.*

ARGUED OCTOBER 31, 2012—DECIDED JULY 25, 2013

Before EASTERBROOK, *Chief Judge*, and WILLIAMS and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Mary Redmond left her home in Illinois at age 19 to attend college in Ireland. There she met Derek Redmond, and the two began a romantic relationship. For most of the next 11 years, the couple lived together in Ireland, though they never married; their common last name is a coincidence.

In 2006 Mary became pregnant. She and Derek agreed that the baby would be born in America but raised in

Ireland. On March 28, 2007, their son, "JMR," was born in Illinois. They returned to Ireland with the baby 11 days later, but their relationship soon deteriorated. On November 10, 2007, Mary moved back to Illinois with JMR against Derek's wishes. The child was not quite eight months old.

Ordinarily a parent in Derek's position might have recourse to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, which requires signatories to promptly return children to the country of their habitual residence when they are "wrongfully removed to or retained in" another country in breach of the custody rights of the left-behind parent. Hague Convention art. 3, *supra*, T.I.A.S. No. 11670. The catch for Derek was that he had no custody rights under Irish law; unmarried fathers in Ireland are not legally recognized as parents, although they may petition a court for guardianship and custody rights. The Hague Convention remedy was unavailable.

Derek thereafter waged a three-and-a-half-year battle to establish his paternity rights in Ireland. On February 10, 2011, an Irish court granted Derek's request for guardianship and joint custody of JMR, and also ordered that the child live in or near Ballymurphy, Ireland. Mary participated in these proceedings and was in Ireland with JMR for the final hearing. The court allowed her to take JMR back to Illinois to make preparations for their move to Ireland, but only on condition that she promise under oath to return with the child by March 30, 2011.

Mary made the promise but did not intend to keep it; she returned to Illinois with JMR and remained with him there. Eight months later Derek filed a Hague Convention petition in federal court in Illinois claiming that Mary wrongfully "retained" JMR in the United States in breach of his newly recognized custody rights in Ireland.

The district court held that as of March 30, 2011, when Mary disobeyed the Irish court's order and the alleged wrongful "retention" occurred, JMR's habitual residence was Ireland. This was so, the court held, even though JMR had lived in the United States almost all his life. The court focused instead on the parents' initial agreement to raise their son in Ireland—their last shared intent about where he would live—and gave this evidence decisive effect. Because Mary's move to Illinois was unilateral, the court concluded that JMR's residence in the United States was temporary and contingent on the results of the Irish guardianship proceeding. The court ordered JMR returned to Ireland. Mary appealed.

We reverse. The district court treated the parents' last shared intent as a kind of fixed doctrinal test for determining a child's habitual residence. It is not. The determination of habitual residence under the Hague Convention is a practical, flexible, factual inquiry that accounts for all available relevant evidence and considers the individual circumstances of each case. Here, the parents' shared intent when JMR was born sheds little light on the question of his habitual residence in 2011. When Mary moved with the baby to Illinois in

November 2007, she had the exclusive right to decide where he would live; because she was JMR's sole legal custodian, his removal from Ireland was not wrongful under the Convention. By March 2011, the time of the alleged wrongful "retention," JMR's life was too firmly rooted in Illinois to consider Ireland his home. Because JMR was habitually resident in the United States, the district court was wrong to order him "returned" to Ireland.

## I. Background

Mary is an American citizen and also a citizen of Ireland through her father, who was born in Ireland. Derek is a citizen of Ireland. In 1996 Mary left her family home in Illinois to attend community college in Ireland, returning during the summers and at other times during the year. She met Derek soon after she arrived, and they began an intimate relationship. She remained in Ireland after completing her associate's degree, and the couple lived together for more than a decade. But they never married.

In 2006 Mary became pregnant. The couple agreed that the child would be born in America but raised in Ireland. They traveled together to the United States, and on March 28, 2007, their son, JMR, was born in Blue Island, Illinois. Derek was present at the birth and signed a voluntary acknowledgment of paternity; he is also listed as JMR's father on the child's birth certificate. Under Illinois law a properly executed voluntary acknowledgment of paternity creates a presumption of paternity

and may serve as a basis for a child-support order without more elaborate proceedings to establish paternity. *See* 750 ILL. COMP. STAT. 45/3, 45/5, 45/6. A child-support order entered pursuant to an acknowledgment of paternity may also include a determination of custody rights, guardianship, and visitation terms. *See id.* § 45/14.

In contrast, in Ireland the natural father of an illegitimate child does not have parental rights. *See* Guardianship of Infants Act, 1964, Part I, § 2 (Act No. 7/1964) (Ir.), *available at* http://www.irishstatutebook.ie/1964/en/act/pub/0007/. Under Irish law "[t]he mother of an illegitimate infant shall be guardian of the infant," *id.* Part II, § 6(4); the definition of "father" excludes "the natural father of an illegitimate infant," *id.* Part I, § 2. An unmarried father may formally petition a court for recognition of paternity and appointment as a guardian of his child, and if recognized may seek a determination of custody and access rights. *See id.* Part I, § 3; Part II, § 11.

In accordance with their original plan, Mary and Derek returned to Ireland with JMR on April 8, 2007, when the baby was 11 days old. The couple remained together for several months, but during this time, their relationship fell apart. Mary alleges in the underlying custody dispute that Derek suffered problems with alcohol and abused her. In November 2007 Mary decided to end the relationship, move back to Illinois, and raise JMR there. On November 10, 2007, she and JMR left Ireland and flew to Illinois.

In February 2008 Mary returned to Ireland with JMR for a visit. The purpose of the trip is not entirely clear.

At least in part, Mary wanted to finish collecting her belongings. She also met with a community welfare officer, either to request information regarding maintenance payments or to apply for "periodic payments" for JMR (we do not know which). On March 25, 2008, while Mary and JMR were still in Ireland, Derek filed a petition for guardianship and custody rights in an Irish court and obtained an ex parte order preventing them from leaving the country. On the basis of this order, Mary and JMR were stopped by authorities at the airport. On April 22, 2008, an Irish court vacated the ex parte order, and Mary left Ireland with JMR the next day.

During the course of the next three years, Mary returned to Ireland periodically to participate in hearings on Derek's guardianship and custody petition. She attended a May 15, 2008 hearing and flew back to Illinois two days later. She returned to Ireland and attended another hearing on June 25, during which the Irish court declined to exercise jurisdiction over the case. Derek appealed this decision, and another hearing was set for July 29. Less than a week before the hearing, Derek obtained an ex parte order requiring that Mary and JMR appear. Mary and JMR did not appear but her counsel filed for a continuance, which was denied. At the hearing the reviewing court reversed the lower court's ruling and held that the court had jurisdiction over Derek's application. Mary appealed. The Irish High Court heard the case on November 18 and ruled against her on November 26, 2008.

Mary then filed her own application in the Irish court to relocate with JMR to the United States permanently.

Dueling petitions were now before the court in Ireland. At a hearing on July 2, 2009, the court ordered that JMR undergo an independent psychiatric assessment, and the court-appointed examiner interviewed JMR and his parents, and also other paternal and maternal relatives. The psychiatric report concluded that JMR was well-adjusted and happy but would benefit from growing up near both parents—an arrangement that could only work if JMR and Mary moved to Ireland given Derek's lack of American citizenship. The report recommended that Derek be granted guardianship and custody rights, and also that JMR live in Ireland so that Derek could have regular access to his son. Finally, the report recommended that the parents develop a parenting plan for JMR with "appropriate weekly and regularized access plans."

Throughout this time JMR lived with Mary in Orland Park, Illinois. More than a year and a half passed from Mary's move to Illinois and the hearing at which the Irish court commenced consideration of Derek's guardianship petition on the merits and ordered a psychiatric evaluation; another year and a half elapsed before the final hearing on February 9, 2011. By the time of that hearing, JMR had spent well over three of his four years in Illinois. He attended daycare and preschool in Orland Park from the age of two and a half, and was enrolled in kindergarten at St. Michael's School in Orland Park for September 2012. He saw a pediatrician and a dentist in Illinois, where all of his medical records were kept. He played on a children's baseball team with the local baseball association, had playdates with

friends, and went to church with his mother and played in the neighborhood park on Sundays. He has a large extended family in Illinois and had frequent contact with his grandparents, aunts, uncles, and cousins. During this time, he periodically traveled to Ireland with Mary, mostly for court proceedings. Between November 2007 and February 2011, he spent about ten and a half separated weeks in Ireland.

On February 10, 2011, the day after the final hearing, the Irish court entered an order denying Mary's application to relocate and granting Derek's request for guardianship and joint custody over JMR. The court ordered that JMR live in Ireland, in or near Ballymurphy, Carlow County, and attend the Ballymurphy National School. Derek and Mary were ordered to share custody on an equal basis. Mary and JMR were in Ireland for the final hearing; the court allowed her to return to Illinois with JMR to wind up her affairs. As a condition of her return to Illinois, Mary promised under oath not to apply to any court outside of Ireland regarding JMR's custody, not to remove JMR to a third country, and to quit her job and move with JMR to Ireland on or before March 30, 2011. The Irish court incorporated these undertakings into its order. For his part Derek promised not to remove JMR to a third country, to pay $200 per month in child support, and to pay for Mary's plane ticket to return to Ireland.

Mary admits that she never intended to keep these promises. On February 15, 2011, she returned to Illinois with JMR, and on March 23 she petitioned for sole

custody in Cook County Circuit Court. The next day she moved for an emergency protective order against Derek alleging a history of abuse and alcohol-related misconduct. The March 30 deadline came and went. Mary did not move to Ireland with JMR as ordered. On May 10, 2011, the Irish court issued a further order compelling Mary to bring JMR to Ireland on or before June 30. This order stated that retaining the child in the United States violated the Hague Convention. Again Mary did not comply.

Back in Cook County Circuit Court, Derek moved through counsel to dismiss Mary's sole-custody petition for lack of jurisdiction under the Uniform Child-Custody Jurisdiction and Enforcement Act, 750 ILL. COMP. STAT. 36/101 *et seq.* Under the Act Illinois courts generally lack jurisdiction over a custody petition when a valid custody order of another state or foreign court already governs the disposition of the child. *See id.* §§ 36/105, 36/206. After conferring with the Irish court, *see id.* § 36/110, the Illinois state-court judge concluded as follows: (1) Derek had timely invoked the jurisdiction of the Irish court; (2) the Irish guardianship and custody decree was issued in substantial conformity with the requirements of the Act; and (3) the decree did not violate fundamental principles of human rights. Accordingly, on July 27, 2011, the Illinois court deferred to the prior claim of jurisdiction by the Irish court, *see id.* §§ 36/105, 36/206, and declined to exercise jurisdiction over Mary's petition.

At this point Derek might have sought registration and enforcement of the Irish decree in Cook County

Circuit Court, along with an order granting him immedi-
ate physical custody of JMR, as provided under the
Uniform Act. *See id.* §§ 36/303-306, 36/310, 36/313. Instead,
on December 1, 2011—five months after the state judge
dismissed Mary's sole-custody petition—Derek filed a
Hague Convention petition in the United States District
Court for the Northern District of Illinois seeking an
order that JMR be returned to Ireland. Derek contended
that by disobeying the Irish custody order, Mary had
wrongfully retained JMR in the United States. The
district court held an evidentiary hearing on June 8, 2012,
and by written order entered on June 19, 2012, granted
Derek's petition. The judge concluded that as of March 30,
2011, when Mary defied the Irish court's order and the
alleged wrongful retention occurred, JMR's habitual
residence was Ireland, not the United States. The judge
ordered JMR returned to Ireland by July 9, 2012, accompa-
nied by Mary.[1]

Mary appealed and asked the district court to stay
the return order pending appeal, but the court denied
the motion. She then moved this court for an emergency
stay. A motions panel denied the stay and also denied
her motion to expedite the appeal. In compliance with

---

[1] We do not know why the court thought it had authority to
order Mary, a free adult citizen, to go to Ireland. As far as
we can determine, neither the Hague Convention nor its
implementing legislation, the International Child Abduction
Remedies Act, 102 Stat. 437 (1988) (codified at 42 U.S.C. §§ 11601
*et seq.* (2006)), authorizes the court to order the relocation
of parents.

the district court's order, JMR was returned to Ireland, where he remains.

## II. Discussion

### A. Mootness

Before addressing the merits, we note a jurisdictional question. Article III of the Constitution limits the federal judicial power to actual, ongoing cases or controversies, a limitation understood to require a live dispute involving a party with "an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). The case-or-controversy requirement "subsists through all stages of federal judicial proceedings, trial and appellate." *Id.* If on appeal it becomes "impossible for a court to grant any effectual relief whatever," the case becomes moot and jurisdiction no longer exists. *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) (internal quotation marks omitted).

At oral argument we asked whether Mary's appeal became moot when JMR was returned to Ireland. The question arose because a favorable decision may not redress Mary's injury; it was not clear as a legal or practical matter that a reversal could secure JMR's "re-return" to Illinois. We ordered supplemental briefing, noting that the Supreme Court had granted certiorari in *Chafin v. Chafin*, 133 S. Ct. 81 (2012), to decide this very question. The Court has now issued its decision in

*Chafin*, holding that an appeal from an adverse return order under the Hague Convention is not rendered moot by the child's return. *Chafin v. Chafin*, 133 S. Ct. 1017, 1028 (2013).

The facts in *Chafin* track the facts of this case in all material respects. There, as here, the parents disputed the question of their child's habitual residence for purposes of the Hague Convention's return remedy. The father claimed it was the United States; the mother claimed it was Scotland. The district court sided with the mother and ordered the child returned to Scotland, and mother and child left for Scotland the next day. *Id.* at 1022. The question before the Supreme Court was "whether, after a child is returned pursuant to [a Hague Convention] order, any appeal of the order is moot." *Id.* at 1021.

The Court applied the standard rule that a case becomes moot only where it is "impossible for a court to grant any effectual relief whatever to the prevailing party." *Id.* at 1023 (citing *Knox*, 132 S. Ct. at 2287). The Court held that the district court's authority to issue a re-return order—either "under the Convention itself or according to general equitable principles"—was a merits question, not a jurisdictional question, and the propriety of a re-return order was not "so implausible that it is insufficient to preserve jurisdiction." *Id.* at 1024. The Court also brushed aside concerns about practical impediments to enforcing a re-return order. Jurisdictional continuation did not depend on the likelihood that a re-return order would be obeyed by the parent with custody or enforced by a foreign court; "difficulties

in enforcement," the Court said, do not render a case moot. *Id.* at 1024-26. Instead, the proper question is *if* the court issues a re-return order, and *if* the custodial parent complies with the order, will the aggrieved parent get the child back? Absent a "law of physics prevent[ing] [the child's] return" or a similar impediment, the answer to that question is generally "yes." *Id.* at 1025. Accordingly, the Court held that a parent's appeal of an adverse return order under the Hague Convention does not become moot by the child's return. *Id.* at 1028.

The holding in *Chafin* resolves the primary mootness concern we raised at oral argument. As a secondary jurisdictional point, we speculated that the appeal may be moot because the Illinois state-court judge has deferred to the Irish court's jurisdiction in the underlying custody battle. In other words, if we reverse and remand and the district court orders JMR returned to Illinois, will he go straight back to Ireland pursuant to the Illinois court's decision? We asked for supplemental briefing on this issue as well, and as things stand right now, the answer to our question is "no." The Irish court's custody ruling was before the Illinois court on the limited question of the court's jurisdiction to decide Mary's petition for sole custody. Derek had asked the Illinois court to defer to the Irish court's earlier claim of jurisdiction under the terms of the Uniform Child-Custody and Jurisdiction Enforcement Act. The court granted Derek's motion and dismissed the petition for lack of subject-matter jurisdiction, but its order did not alter the status quo; that is, the Illinois court did not

give effect to the Irish court's order. The decision clears the way for Derek to register the Irish order in the Cook County Circuit Court and seek its enforcement under the Uniform Act, but as far as the record discloses, he has not yet sought that relief. In the meantime, Mary has moved for reconsideration of the court's jurisdictional ruling, and that motion is stayed pending the outcome of these proceedings. *See* Agreed Order, *Redmond v. Redmond*, No. 11 D 79473 (Circuit Ct. of Cook Cnty.) (filed Oct. 22, 2012). If Mary's motion for reconsideration is denied, she may appeal.

The upshot of all this is that the Illinois court's jurisdictional decision does not moot this appeal. Unwinding the district court's return order will not inevitably result in a speedy transatlantic round trip for JMR. Here, as in *Chafin*, "[t]his dispute is still very much alive." *Chafin*, 133 S. Ct. at 1023. The question of JMR's habitual residence is contested, and the correct answer determines the propriety of the district court's return order. Reversal may precipitate new legal and practical challenges surrounding JMR's re-return, and if the child is returned to Illinois, he may not stay for long. His status will depend on the outcome of the presently pending litigation—and possible future litigation—in the Illinois state courts. But Mary unquestionably has an interest in the return of her son, and "however small that concrete interest may be due to potential difficulties in enforcement, it is not simply a matter of academic debate, and is enough to save this case from mootness." *Id.* at 1026 (alterations and internal quotation marks omitted).

**B. Was JMR Wrongfully Retained in the United States?**

The Hague Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 130 S. Ct. 1983, 1989 (2010). The Convention aims "to deter parents from absconding with their children and crossing international borders in the hopes of obtaining a favorable custody determination in a friendlier jurisdiction." *Walker v. Walker*, 701 F.3d 1110, 1116 (7th Cir. 2012). The Convention's main purpose is to "secure the prompt return of children wrongfully removed to or retained in" another signatory State. Hague Convention art. 1, *supra*, T.I.A.S. No. 11670. Among other things, signatory States commit to have in place judicial and administrative remedies for the return of children taken from the State of their habitual residence to another signatory State in violation of the left-behind parent's custody rights under the law of the State of the child's habitual residence. *Id.* arts. 3, 4, 7, 12. The United States implements the Hague Convention via the International Child Abduction Remedies Act ("ICARA"), 102 Stat. 437 (1988) (codified at 42 U.S.C. §§ 11601 *et seq.* (2006)) (authorizing federal courts to entertain Hague Convention petitions).

The central question in any petition seeking the return of a child under the Hague Convention and ICARA is whether the child who is the subject of the petition has been "wrongfully" removed or retained within the meaning of the Convention. Article 3 of the Convention defines the concept of "wrongful" removal or retention:

The removal or the retention of a child is to be considered wrongful where—

a) it is in breach of rights of custody attributed to a person, an institution[,] or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention[,] those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention art. 3, *supra*, T.I.A.S. No. 11670. This definition reflects the basic premise of the Convention's return remedy:

In order for the Convention to apply[,] the child must have been "habitually resident in a Contracting State immediately before any breach of custody . . . rights." Article 4. *In practical terms, the Convention may be invoked only where the child was habitually resident in a Contracting State and taken to or retained in another Contracting State.*

Department of State, Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,504 (Mar. 26, 1986) (emphasis added). In addition, a court faced with a Hague petition must keep the following important principle in mind:

A Hague Convention case is not a child custody case. Rather, a Hague Convention case is more akin to a provisional remedy—to determine if the child was wrongfully removed or kept away from his or

her habitual residence, and if so, then to order the child returned to that nation. The merits of the child custody case—what a parent's custody and visitation rights should be—are questions that are reserved for the courts of the habitual residence.

JAMES D. GARBOLINO, FED. JUDICIAL CTR., THE 1980 HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION: A GUIDE FOR JUDGES *ix* (2012).

Accordingly, a Hague Convention case asks the following questions in this order: (1) When did the removal or retention of the child occur? (2) In what State was the child habitually resident immediately prior to the removal or retention? (3) Was the removal or retention in breach of the custody rights of the petitioning parent under the law of the State of the child's habitual residence? and (4) Was the petitioning parent exercising those rights at the time of the unlawful removal or retention? *See Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006); *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001). The first two questions are factual inquiries centering on the determination of the child's habitual residence; the second two questions involve both legal *and* factual inquiries regarding the left-behind parent's custody rights under the law of the State of the child's habitual residence and whether the parent was actually exercising those rights at the time of the removal or retention.[2]

---

[2] The Convention also contains several defenses that may be asserted against a prima facie case for a return order, *see*

(continued...)

**1.  *An anomaly in Derek's Hague Convention petition***

We note at the outset that this is not a case of wrongful *removal*. Derek does not argue, nor could he, that Mary's move with JMR from Ireland to Illinois in November 2007 was wrongful under the Hague Convention.[3] Under Irish law only the mother is recognized as the guardian of an illegitimate child; Ireland does not presumptively confer parental rights on unmarried fathers. The "rights of custody" at issue in a Hague Convention petition are "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention art. 5(a), *supra*, T.I.A.S. 11670. They arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law [of the child's habitual residence]." *Id.* art. 3. As of November 2007, when Mary moved with JMR to the United States, Derek had no custody rights to assert against Mary's removal of their son from Ireland; under Irish law he was not recognized as JMR's legal guardian and had no right to direct the child's

_____

[2]  (...continued)

Hague Convention on the Civil Aspects of International Child Abduction arts. 12, 13, 20, Oct. 25, 1980, T.I.A.S. No. 11670, but they are not relevant here.

[3]  Derek initially alleged in his petition that Mary's removal of JMR from Ireland in November 2007 was wrongful under the Hague Convention, but he has dropped that claim.

upbringing or decide where he would live.[4] So it is no surprise that Derek does not challenge Mary's removal of JMR from Ireland in November 2007. Assuming that Ireland was the child's habitual residence at that time, Mary's conduct was not wrongful under the Hague Convention.[5] *See, e.g., White v. White,* No. 12-1835, 2013 WL

---

[4] As we have explained, Derek's voluntary acknowledgment of paternity gave rise to a presumption of paternity in Illinois. After Mary and JMR moved to Illinois, he could have filed an action in Illinois state court to perfect his paternity rights, acknowledge his support obligation, and obtain a determination of custody. Instead, he spent years litigating the recognition of his paternity, guardianship, and custody rights in Ireland. By foregoing the available Illinois remedies to establish joint custody under Illinois law—thus establishing his joint right to direct where JMR would live—Derek enabled Mary to fix JMR's residence in the United States. *Cf. Kijowska v. Haines,* 463 F.3d 583, 589 (7th Cir. 2006) (the father's failure to pursue available remedies after the mother relocated the child to Poland "enabled [the child] to obtain a habitual residence in the country to which her mother took her").

[5] Mary hints that the entire inquiry could end here. She suggests that the only date relevant to the analysis is November 10, 2007, when she removed JMR from Ireland, and because her conduct was not wrongful as of that date, further analysis is unnecessary. We disagree, although the point has intuitive force. The cases refer to the "first step" in a Hague petition—in which the court identifies the date of the alleged wrongful removal or retention—because the court must determine the child's habitual residence "immediately before" the alleged removal or

(continued...)

2284877, at *4-5 (4th Cir. May 24, 2013) (holding that the mother's removal of her son from Switzerland was not wrongful under the Hague Convention because the child's father lacked custody rights under Swiss law, giving her sole custody of the child and the exclusive authority to move with him to the United States).

---

[5] (...continued)
retention. Hague Convention art. 3, *supra*, T.I.A.S. No. 11670. In the case of alleged wrongful removals, that date is fairly easy to ascertain; with alleged wrongful retentions, however, the answer is not always clear. *See* JAMES D. GARBOLINO, FED. JUDICIAL CTR., THE 1980 HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION: A GUIDE FOR JUDGES 24 (2012). Wrongful retentions typically occur when a parent takes a child abroad promising to return with the child and then reneges on that promise; disputes sometimes arise over when such a temporary sojourn ripens into a wrongful retention. *See, e.g., Walker v. Walker*, 701 F.3d 1110, 1118 (7th Cir. 2012).

In a given Hague Convention case, an "abduction" might have occurred on one of several dates; the question is always whether there was *any* date on which a wrongful removal or retention occurred. A court may entertain the possibility that a wrongful removal occurred on one date, conclude that the child's removal on that date was not wrongful, then move on to other possibilities. The district court conducted this kind of analysis, in substance if not in form. The court skipped over the question of JMR's removal from Ireland, implicitly concluding that it was not wrongful, and then moved forward in time to determine when a wrongful retention might have occurred.

Instead, Derek contends that Mary wrongfully "retained" JMR in the United States on or after March 30, 2011, when she failed to return with him to Ireland in violation of the Irish court's guardianship and custody order. This is an unconventional use of the Hague Convention—one that raises a threshold question about its scope. The child-return remedy is a potent and important one, but its application is limited, and the limited nature of the remedy must be kept in mind to avoid drawing federal courts into the merits of international custody disputes. *See Koch v. Koch*, 450 F.3d 703, 711 (7th Cir. 2006) ("An action under the Convention and ICARA is not an action to determine the merits of custody rights.").

The Hague Convention is an antiabduction treaty; it is "'not a treaty on the recognition and enforcement of [foreign] decisions on custody.'" *Barzilay v. Barzilay*, 600 F.3d 912, 921-22 (8th Cir. 2010) (quoting Elisa Pérez-Vera, *Explanatory Report on the 1980 Hague Child Abduction Convention*, *in* HAGUE CONFERENCE ON PRIVATE INT'L LAW, 3 ACTS AND DOCUMENTS OF THE FOURTEENTH SESSION, CHILD ABDUCTION 426, 435 (1982)); *see also Koch*, 450 F.3d at 711 (recognizing the Pérez-Vera report as the official history of the Hague Convention and an authoritative source of its meaning and scope); *Holder v. Holder*, 392 F.3d 1009, 1013 (9th Cir. 2004) (same). "The Convention's procedures are not designed to settle international custody disputes, but rather to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases." *Karkkainen*, 445 F.3d at 287; *see also*

*Koch*, 450 F.3d at 711; *Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004); *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996).

Nor does the Convention contain rules for resolving competing claims of jurisdiction in international custody struggles or procedures for obtaining recognition and enforcement of foreign judgments or orders governing child custody. As we have explained, those rules and procedures are found in state law under the Uniform Child-Custody Jurisdiction and Enforcement Act. *See* 750 ILL. COMP. STAT. 36/110 *et seq.* (the Uniform Act, as adopted in Illinois); *id.* § 36/105 (governing the international aspects of the Act).[6] The court's inquiry in a Hague petition is limited to the merits of the abduction claim; the Convention is not a vehicle for resolving competing jurisdictional or merits claims in the underlying custody dispute. *Cf. Ruiz*, 392 F.3d at 1250.

Here, Derek seems to be using the Hague Convention as a substitute for an action in Illinois state court under the Uniform Act to enforce his newly recognized custody rights pursuant to the Irish court's order. Perhaps this invocation of the Convention's remedy is permissible under an expansive understanding of the term "retention," but we have our doubts. Although

---

[6] The Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), 9 U.L.A. 657 (Master ed.) (1999), has been adopted in 49 states, the District of Columbia, Guam, and the U.S. Virgin Islands. *See id.* Table of Jurisdictions, 9 U.L.A. 114-15 (Supp. 2012).

Derek has won a legal victory in Ireland and his custody rights are now recognized in the courts of his country, it's hard to see how Mary's refusal to comply with the Irish court's order is, without more, a "retention" of JMR in the sense meant by the Convention. Derek's petition thus presents a threshold question: Is a change in one parent's custody rights enough to make the other's parent's continued physical custody of the child a putative wrongful "retention" under the Convention? Stated differently, does the parent with physical custody of a child commit a wrongful retention—colloquially, an "abduction"—by reneging on a promise, made under oath, to obey a newly entered custody order in favor of the other parent?

We asked for supplemental briefing on this question as well, but the parties seem to have missed our point. As far as we can tell, this is a question of first impression in this circuit and in most other circuits as well. The Eighth Circuit has come closest to addressing the issue. In *Barzilay* Israeli parents lived with their three children in Missouri for several years. 600 F.3d at 914-15. They divorced and the father returned to Israel. *Id.* at 915. On a visit to Israel, the mother and three children were hailed into an Israeli court, and as a condition of allowing them to return to the United States, the court entered a consent judgment providing that Israel was the stipulated habitual residence of the children and giving the father custody rights. *Id*. After returning to the United States, the mother refused to send the children back. *Id*. The father asserted that her refusal constituted a wrongful retention, placing great emphasis on the

Israeli court's consent judgment, *id.* at 916, 919; he also relied on an earlier stipulation in the Missouri divorce proceeding that the entire family would return to Israel if either parent did, *id*.

The Eighth Circuit first addressed the question of habitual residence and affirmed the district court's finding that the circumstances of the children's lives clearly established Missouri as their home. *Id.* at 915. The court then rejected the father's reliance on the Israeli consent judgment and the Missouri repatriation stipulation, noting that although he characterized these agreements as "prospective stipulations of habitual residence," they were "in fact custody decrees," and the father was "trying to use the Hague Convention as a vehicle to enforce his custody rights[] simply by relabeling them as stipulations of habitual residence." *Id.* at 921. The court explained the problem this way:

> Having obtained a favorable judgment [in the Israeli court], [the father] then turned to the federal court seeking enforcement of his newly minted custody rights through [a Hague Convention] petition. This course of litigation not only betrays a fundamental misunderstanding of the Hague Convention, but [is] also precisely the sort of international forum shopping the Convention seeks to prevent.

*Id.* at 922.[7]

---

[7] *Barzilay* thus refused to give preclusive effect to the habitual-residence determination in the Israeli court's consent judg-

(continued…)

The Fourth Circuit's recent decision in *White* is also instructive. There, a husband and wife living in Switzerland with their son obtained an order of legal separation that gave custody of the child to the mother and limited visitation rights to the father. *White*, 2013 WL 2284877, at *3-4. The mother then moved with her son to the United States. The father filed a Hague Convention petition seeking return of the child, and in the meantime, the Swiss court adjusted its ordering of parental rights, giving the father legal custody and the mother visitation

---

[7] (...continued)

ment. Under ICARA American courts must give full faith and credit to the Hague Convention determinations of other American courts, state or federal, but only when those determinations are rendered "pursuant to the Convention, in an action brought under [ICARA and the Convention]." 42 U.S.C. § 11603(g). This special preclusion rule does not, on its face, affirmatively authorize American courts to apply res judicata principles to the Hague Convention determinations of *foreign* courts; it's an open question whether it *precludes* application of res judicata principles to foreign Hague Convention determinations. *See Holder v. Holder*, 305 F.3d 854, 864-65 (9th Cir. 2002). Applying general preclusion doctrine to Hague Convention determinations by foreign courts raises complex comity considerations in the context of a treaty that itself targets international forum shopping. Derek has not raised the preclusion issue or otherwise relied on the Irish court's determination that Mary's retention of JMR in Illinois violated the Hague Convention. Accordingly, he has forfeited the issue. *See, e.g., Simmons v. Gillespie*, 712 F.3d 1041, 1041 (7th Cir. 2013); *Marcus v. Sullivan*, 926 F.2d 604, 614 (7th Cir. 1991).

rights only. *Id.* The district court concluded that the mother's removal of the child from Switzerland was not wrongful because she had the sole right of custody, and the Fourth Circuit affirmed. The court noted that at the time of removal, the father had only visitation rights, which are insufficient to support the Convention's return remedy. *Id.* at *3-5 (explaining that the visitation rights—known as "rights of access" under the Convention—are not a basis for the return remedy). The court also held that the Swiss court's later custody order—issued two years after the child's removal to the United States—was ineffective to render the removal "wrongful" under the Convention. *Id.* at *6-7. Although the Fourth Circuit did not separately address the issue of "retention," the court did note that "[State] signatories [to the Convention] agree that orders claiming to adjust custody arrangements *after* removal or retention do not typically affect rights under Article 3 of the Convention." *Id.* at *6 (emphasis added).

Although our case is not perfectly analogous to either *Barzilay* or *White*, the basic point is the same. The Hague Convention targets international child abduction; it is not a jurisdiction-allocation or full-faith-and-credit treaty. It does not provide a remedy for the recognition and enforcement of foreign custody orders or procedures for vindicating a wronged parent's custody rights more generally. Those rules are provided in the Uniform Child-Custody Jurisdiction and Enforcement Act. Rather than applying to the Cook County Circuit Court for enforcement of the Irish custody order under the Uniform Act, Derek sought to enforce his newly declared

custody rights via a Hague petition by treating Mary's refusal to comply with the Irish court's order as a wrongful "retention" of their son in the United States. But the concepts of removal and retention can be understood only by reference to the child's habitual residence; a legal adjustment of a parent's custody rights does not by itself give rise to an abduction claim. "The determination of a child's habitual residence is significant because wrongful removal can occur only if the child has been taken away from his or her habitual residence." GARBOLINO, FED. JUDICIAL CTR., *supra*, at 41.

A fundamental premise of the Hague Convention is that the interests of children are best served when they remain in their country of habitual residence while their parents resolve contested custody questions in the courts of that country. When a child is taken from its country of habitual residence, the left-behind parent may invoke the Convention's return remedy to restore the factual status quo—in ordinary language, to bring an abducted child home. But a parent may *not* use the Convention to *alter* the child's residential status based on a legal development in the parent's favor. The availability of the return remedy depends on the child's habitual residence because the "retention of a child in the state of its habitual residence is not wrongful under the Convention." *Barzilay*, 600 F.3d at 916. Or as the Second Circuit put it:

> A petitioner cannot invoke the protection of the Hague Convention unless the child to whom the petition relates is "habitually resident" in a State

signatory to the Convention and has been removed to or retained in a different State. The petitioner must then show that the removal or retention is "wrongful."

*Gitter v. Gitter*, 396 F.3d 124, 130 (2d Cir. 2005).

Accordingly, every Hague Convention petition turns on the threshold determination of the child's habitual residence; all other Hague determinations flow from that decision. If a child has not been moved from its habitual residence, there is no "left-behind" parent with grounds to complain about the move, and it makes no sense to speak in terms of ordering the child's "return." In that situation, relief under the Hague Convention must be denied without further inquiry into whether the petitioning parent's custody rights have been breached or whether the petitioning parent was actually exercising those rights at the relevant time.

### 2. *JMR's habitual residence*

With these background understandings in place, we proceed to the disputed question of JMR's habitual residence. Our review of the district court's decision is subject to a split standard of review; findings of fact are reviewed for clear error, issues of law are reviewed de novo, and "[t]he ultimate determination of habitual residence is a mixed question of law and fact to which we will apply *de novo* review." *Koch*, 450 F.3d at 710. There is no real dispute about the historical facts; this appeal turns on the ultimate determination of JMR's habitual residence.

The Convention does not define the term "habitual residence." Early courts faced with Hague petitions

sought to avoid overcomplicating the issue of habitual residence with layers of rigid doctrine. An English opinion widely cited in American courts expressed this aspiration nicely:

> "It is greatly to be hoped that the courts will resist the temptation to develop detailed and restrictive rules as to habitual residence, which might make it as technical a term of art as common law domicile. The facts and circumstances of each case should continue to be assessed without resort to presumptions or pre-suppositions."

*Re Bates* (1989), No. CA 122/89 (High Ct. of Justice, Fam. Div., Eng.), 1989 WL 1683783 (quoting ALBERT VENN DICEY & JOHN HUMPHREY CARLILE MORRIS, THE CONFLICTS OF LAWS 166 (11th ed. 1987)); *see Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir. 2004) (citing quoted passage); *Silverman v. Silverman*, 312 F.3d 914, 916 (8th Cir. 2002) (same); *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993) (same). We elaborated on this point in *Kijowska v. Haines*:

> The determination of "habitual residence" is to be made on the basis of the everyday meaning of these words rather than the legal meaning that a particular jurisdiction attaches to them, as otherwise forum shopping would come in by the back door—each contestant would seek a forum that would define "habitual residence" in the contestant's favor.

463 F.3d 583, 586 (7th Cir. 2006).

Accordingly, we interpret the phrase "habitual residence" in accordance with "the ordinary and natural

meaning of the two words it contains, as a question of fact to be decided by reference to all the circumstances of any particular case." *Mozes*, 239 F.3d at 1071 (internal quotation marks and alterations omitted); *see also Norinder v. Fuentes*, 657 F.3d 526, 534 (7th Cir. 2011); *Kijowska*, 463 F.3d at 586; *Koch*, 450 F.3d at 712. Determining a child's habitual residence thus requires an assessment of the observable facts on the ground, not an inquiry into the child's or parent's legal status in a particular place. Only *after* habitual residence is determined does an examination of custody rights come into play; treating the question of habitual residence as a legal inquiry would misconstrue the Convention as a custody-rights enforcement treaty.

Under this commonsense and fact-based approach, we think it clear that as of March 30, 2011, when the alleged wrongful retention occurred, JMR habitually resided in Illinois and had for some time. He was born in Illinois, and except for seven and a half months of his infancy, he lived continuously in Illinois with only periodic, brief visits to Ireland. By March 30, 2011, he had spent more than three of his four years in Illinois—approximately 80% of his young life. It is true that the length of time a child has spent in one place is not dispositive and must be considered with care. We have recognized that "[t]he length of the child's residence in the country of one of the parents cannot be decisive. [A] parent cannot create a new 'habitual residence' by the wrongful removal and sequestering of a child. That would invite abduction." *Kijowkska*, 463 F.3d at 587 (internal quotation marks and citations omitted). Here, however, Mary's removal of JMR from Ireland was not wrongful, so

giving weight to the substantial duration of the child's residence in the United States does not undermine the purposes of the Convention.

In addition to the length of time JMR had spent in the United States prior to the Irish court's order, the everyday details of his life confirm that Illinois was home. JMR had frequent contact with his extended family in Illinois; he received regular care from an Illinois pediatrician and an Illinois dentist; he went to daycare, preschool, and church in Orland Park; he had neighborhood friends and played on a children's baseball team in the area. The district court credited this evidence: "[T]hese facts, coupled with the passage of nearly three-and-a-half years of very early childhood, suggest that JMR is happy and well-adjusted to his life in Illinois."

In contrast, on March 30, 2011, JMR's ties to Ireland were tenuous. As of that date, he had spent only a small fraction of his life in Ireland—not more than 20%—and much of that time was prior to his initial move to Illinois when he was an infant. After the move, which occurred when he was not yet eight months old, JMR spent only about ten and a half separated weeks in Ireland and then primarily for the purpose of attending court proceedings. Although Derek and his extended family live in Ireland, these ties, without more, do not translate to habitual residence. As of March 30, 2011, any objective observer of the facts of JMR's everyday life would not call Ireland the child's home.

The district court recognized that JMR's life was firmly situated in Illinois but held that his residence in

the United States was only "temporary" and "contingent" based on the evidence of the last shared intent of his parents about where he would live. The last time Mary and Derek agreed on anything, they agreed that their son should be raised in Ireland; this parental intent to raise JMR in Ireland and his presence there during his first seven months were enough to establish his habitual residence in Ireland as of the fall of 2007. When in early November 2007 Mary abandoned the couple's earlier plans and relocated with JMR to Illinois, she did so unilaterally, and the district court chose to disregard her unilateral intent. The court held that Mary "was fully aware" that JMR's stay in Illinois depended on the outcome of the Irish custody proceedings, so her "hopes and desires" about JMR's life were ineffective to establish his habitual residence in the United States.

The district court's reliance on the parents' last shared intent was misplaced, though perhaps understandable. Many Hague Convention cases emphasize the last shared intent of the parents as an important factor in the analysis of a child's habitual residence. But the habitual-residence inquiry remains a flexible one, sensitive to the unique circumstances of the case and informed by common sense. The parents' last shared intent is one fact among others, and indeed may be a very important fact in some cases. But it is not a uniformly applicable "test" for determining habitual residence, as the district court seemed to think.

Not all circuits agree on the role or significance of parental intent in resolving habitual-residence questions.

In one of the earliest American applications of the Hague Convention, the Sixth Circuit held that "[t]o determine the habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions." *Friedrich*, 983 F.2d at 1401. In *Friedrich* an American woman married a German man and they had a son. When the child was a year and a half, she separated from her husband and moved with the child from Germany to the United States without the father's knowledge or consent. In the ensuing Hague Convention proceedings, she claimed that her son habitually resided in the United States simply because she wanted to raise him there, even though the child had been born in Germany and had spent his entire life prior to removal there. The court rejected her argument:

> All of the factors listed by Mrs. Friedrich pertain to the future. Moreover, they reflect the *intentions* of Mrs. Friedrich; it is the habitual residence of the child that must be determined. Mrs. Friedrich undoubtedly established ties between Thomas and the United States and may well have *intended* for Thomas to move to the United States at some time in the future. But before Mrs. Friedrich removed Thomas to the United States without the knowledge or consent of Mr. Friedrich, Thomas had resided exclusively in Germany. *Any future plans that Mrs. Friedrich had for Thomas to reside in the United States are irrelevant to our inquiry.*

*Id.* (emphases added).

So the Sixth Circuit focuses on habitual residence from the child's perspective, downplaying parental intent.

*See id.* The Third and Eighth Circuits have generally followed suit. *See, e.g.*, *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995) ("[A] child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' *from the child's perspective*. . . . [A] determination of whether any particular place satisfies this standard must *focus on the child* and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions . . . ." (emphases added)); *Barzilay*, 600 F.3d at 918 (8th Cir.) ("The 'settled purpose' of a family's move to a new country is a central element of the habitual residence inquiry. . . . [T]he settled purpose must be *from the child's perspective*, although parental intent is also taken into account." (emphasis added) (internal quotation marks omitted)).

On the other hand, the Ninth Circuit emphasizes the parents' perspective, explaining in its influential opinion in *Mozes* that the concept of habitual residence is based on the "settled purpose" to live in a particular place. 239 F.3d at 1074. It is not the child's purpose that matters, however. "[T]he intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence"—usually, the parents. *Id.* at 1076 (internal quotation marks omitted). When parents jointly intend to raise a child in a place and actually live there, that place becomes the child's habitual residence. The child's habitual residence may change later if the parents mutually intend to abandon the residence in favor of a

new one, but only a *shared* intent will do; the unilateral intent of a single parent will not. *Id.* at 1075-77.

This is not to say that the Ninth Circuit ignores the child's perspective entirely. In some circumstances "a child's life may become so firmly embedded in the new country as to make it habitually resident even though there be lingering parental intentions to the contrary." *Id.* at 1078. But "in the absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned." *Id.* at 1079. A court should infer a change in habitual residence only where "the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place"; that is, when the court "can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child out of the family and social environment in which its life has developed." *Id.* at 1081 (internal quotation marks omitted).

A majority of the circuits have preferred the Ninth Circuit's approach and adopted the so-called "*Mozes* framework." *See Gitter*, 396 F.3d at 131 (2d Cir.); *Maxwell v. Maxwell*, 588 F.3d 245, 251 (4th Cir. 2009); *Ruiz*, 392 F.3d at 1252 (11th Cir.). We too have "adopted a version of the analysis set out by the Ninth Circuit in *Mozes*." *Norinder*, 657 F.3d at 534 (citing *Koch*, 450 F.3d at 715). Conventional wisdom thus recognizes a split between the circuits that follow *Mozes* and those that use

a more child-centric approach, but we think the differences are not as great as they might seem. Although the Third, Sixth, and Eighth Circuits focus on the child's perspective, they consider parental intent, too. In *Feder* the Third Circuit observed that the inquiry into a child's habitual residence "must focus on the child and consists of an analysis of the child's circumstances in that place *and the parents' present, shared intentions regarding their child's presence there*." 63 F.3d at 224 (emphasis added). *Feder* reversed the district court's habitual-residence determination precisely because the district court had given insufficient attention to the intentions of one of the parents. *See id.* Similarly, in the Eighth Circuit, "[t]he 'settled purpose' of a family's move to a new country is a central element of the habitual residence inquiry. . . . [T]he settled purpose must be from the child's perspective, *although parental intent is also taken into account*." *Barzilay*, 600 F.3d at 918 (emphasis added).

The same is true on the other side. Although the *Mozes* framework focuses on the shared intent of the parents, the child's "acclimatization" in a country has an important role to play. Indeed, the Ninth Circuit explained in *Mozes* that "a child's life may become so firmly embedded in the new country as to make it habitually resident even though there be lingering parental intentions to the contrary." 239 F.3d at 1078. We have emphasized that the *Mozes* approach is "flexible" and takes account of "the realities of children's and family's lives despite the parent's hopes for the future." *Koch*, 450 F.3d at 715-16.

In substance, all circuits—ours included—consider *both* parental intent *and* the child's acclimatization, differing only in their emphasis. The crux of disagreement is how much weight to give one or the other, especially where the evidence conflicts. *See Karkkainen*, 445 F.3d at 297 (describing the disagreement among the circuits as a difference of opinion about how to "weigh [parental intent and the child's acclimatization] against each other if they conflict[]"). We have not yet had occasion to resolve how to balance the parents' and child's perspectives, but nothing in our caselaw justifies the overwhelming weight the district court gave the parents' last shared intent at the expense of the undisputed evidence of JMR's acclimatization. To repeat, in loosely adopting the *Mozes* framework, we highlighted its flexibility. *See Koch*, 450 F.3d at 715. We emphasized that the inquiry is "not . . . rigid" and "does not require courts to ignore reality," *id.* at 716, and noted that the Ninth Circuit had acknowledged as much when it said in a subsequent case that "it was 'keenly aware of the flexible, fact-specific nature of the habitual residence inquiry envisioned by the Convention,'" *id.* (quoting *Holder*, 392 F.3d at 1015).

In the final analysis, the court's focus must remain on "the *child[]'s* habitual residence." *Holder*, 392 F.3d at 1016 (emphasis added). Shared parental intent may be a proper starting point in many cases because "[p]arental intent acts as a surrogate" in cases involving very young children for whom the concept of acclimatization has little meaning. *Id.* at 1016-17. "Acclimatization is an ineffectual standard by which to judge habitual

residence in such circumstances because the child lacks the ability to truly acclimatize to a new environment." *Karkkainen*, 445 F.3d at 296. On the other hand, an emphasis on shared parental intent "does not work when . . . the parents are estranged essentially from the outset." *Kijowska*, 463 F.3d at 587. In short, the concept of "last shared parental intent" is not a fixed doctrinal requirement, and we think it unwise to set in stone the relative weights of parental intent and the child's acclimatization. The habitual-residence inquiry remains essentially fact-bound, practical, and unencumbered with rigid rules, formulas, or presumptions. *See Kijowska*, 463 F.3d at 586; *Karkkainen*, 445 F.3d at 291; *Friedrich*, 983 F.2d at 1401; *Re Bates*, No. CA 122/89.

Here, all relevant indicators point to Illinois as JMR's habitual residence. We already have discussed JMR's perspective; by all accounts and by any measure, Illinois was his home. That leaves the matter of how to weigh parental intent. On this issue the district court erred by heavily weighting the parents' last shared intent. That might make sense when both parents have the right to fix the child's place of residence, but shared intent has less salience when only one parent has the legal right to do so. "[T]he intention or purpose which has to be taken into account is that of the *person or persons* entitled to fix the place of the child's residence." *Mozes*, 239 F.3d at 1076 (emphasis added) (internal quotation marks omitted). Most often two parents exercise that authority jointly, but not always. Here, Mary had sole custody under Irish law from the time of JMR's

birth until March 2011; as such, she had the exclusive right to fix the place of JMR's residence.

Because Mary had the lawful authority to relocate without Derek's consent, JMR's residence in Illinois was neither "temporary" in fact nor wrongful as a matter of law under the Hague Convention. Moreover, the actual facts of JMR's life in Orland Park and his thoroughgoing acclimatization there for almost all of his life suffice to establish the United States as JMR's habitual residence notwithstanding Derek's objections. Mary and Derek were "estranged essentially from the outset." *Kijowska*, 463 F.3d at 587. Under the circumstances here, JMR's acclimatization in Illinois overwhelmingly outweighs the last shared parental intent. Immediately prior to March 30, 2011, when the alleged wrongful retention occurred, JMR's life was in Illinois, and legitimately so. Based on a commonsense view of all the evidence, we "can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to [Ireland] would now be tantamount to taking the child out of the family and social environment in which its life has developed." *Mozes*, 239 F.3d at 1081 (internal quotation marks omitted).

Accordingly, immediately prior to March 30, 2011, JMR was habitually resident in Illinois, so sending him to Ireland was *not* sending him home. *See Holder*, 392 F.3d at 1019 ("Simply put, would returning the children to Germany be tantamount to sending them home?"). Mary and Derek are obviously locked in an international struggle over JMR's custody, and the potential for a jurisdictional

conflict remains. But the Hague Convention does not provide a procedure for resolving the disputed jurisdictional and merits claims in this child-custody battle. Because JMR was habitually resident in Illinois, Mary did not wrongfully retain him in the United States. The district court should not have ordered the child returned to Ireland. For the foregoing reasons, we REVERSE the district court's order and REMAND this case for further proceedings consistent with this opinion.[8]

---

[8] Although the Supreme Court did not decide the matter in *Chafin*, and the parties have not briefed the question here, we think it clear that the court has the equitable authority to issue an order requiring JMR's return to the United States. That's the position of the U.S. Department of State, the designated Central Authority for assisting the implementation of the Hague Convention in the United States. On its behalf the United States filed an amicus curiae brief in *Chafin* explaining its position that because the court has the inherent equitable power to order the child's re-return, an appeal of a return order under the Hague Convention does not become moot by the return of the child. *See* Br. for the U.S. as Amicus Curiae Supporting Pet'r at 14-18, *Chafin v. Chafin,* 133 S. Ct. 1017 (2013) (No. 11-1347), 2012 WL 7069914 at *14-18; *see also id.* at 15, 2012 WL 7069914 at *15 ("If the court of appeals concluded that the district court's return order was erroneous because the United States was the country of the child's habitual residence, it could reverse the district court's decision and order respondent to bring the child back to the United States.").

EASTERBROOK, *Chief Judge*, dubitante. *Chafin v. Chafin*, 133 S. Ct. 81 (2012), shows that this litigation is not moot, despite the fact that JMR is in Ireland. Still, I find it hard to understand why this litigation continues or how any good can come of it.

The Hague Convention on the Civil Aspects of International Child Abduction specifies where a child is to stay while the normal legal procedures for determining ultimate custody run their course. Yet here the order or decision has been reversed. The courts of Ireland have reached a final decision and awarded custody to Derek Redmond. The courts of Illinois also have reached a final decision and concluded that they have no warrant to disagree with the Irish decision. Unlike the common situation in which each parent runs to the jurisdiction he or she thinks favorable and obtains an *ex parte* order of custody, both the Irish and the Illinois proceedings were adversarial, producing judgments that bind both parents *in personam*. This litigation under the Hague Convention did not even begin until both Ireland and Illinois had made their decisions about JMR's custody. Instead of asking officials in Illinois to send JMR to Ireland, Derek filed suit under the Hague Convention.

Mary Redmond not only is bound by the Irish judgment awarding custody to Derek but also promised to obey that judgment. Her promise was essential to obtaining permission to travel with JMR to Illinois, purportedly to tidy up a few personal matters in preparation for a long-term stay in Ireland. Mary broke her promise and defied the Irish judgment. Ireland considers

her a fugitive from justice (her contempt of court is obvious), which also makes it impossible to see how she can realistically hope to obtain lawful custody of JMR in Illinois. It is not simply that she violated both a valid judicial order and her own undertaking; it is that she has revealed that she will violate any order in Derek's favor. No legal system can accept that "heads I win, tails you lose" approach. See *Homola v. McNamara*, 59 F.3d 647 (7th Cir. 1995). Mary has disqualified herself as a candidate for favorable treatment by the judiciary of any state or nation.

Yet the parties have not asked us to dismiss the federal suit on the ground that the suits in Ireland and Illinois are over. Nor has Derek invoked the Irish judgment as a ground of issue or claim preclusion, even though the Irish court not only awarded Derek joint custody as a matter of Ireland's domestic law but also concluded, under the Hague Convention, that Mary's custody of JMR in Illinois was wrongful. The parties' indifference to principles of preclusion is why my colleagues proceed to render a second decision under the Hague Convention—one at odds with Ireland's. This is within the judicial power, given *Chafin*, but teeters on the brink of being an advisory opinion. Under *Chafin* the district court has the legal power to direct a parent to return a child to the United States (see slip op. 40 n.8), but given the Irish judgment—whose validity the parties do not question—it would be an abuse of discretion to issue such an order to Derek.

That's not the only problem with this litigation. My colleagues discuss at length where JMR was "habitually

resident" when Mary violated the Irish judgment and retained JMR in Illinois. The premise of this discussion is that JMR was lawfully present in Illinois, in Mary's custody, beginning in November 2007, when she unilaterally removed JMR from Ireland. JMR's presence in Illinois was lawful, and therefore counts toward establishing "habitual residence", because under Irish law Derek, as an unmarried father, had no right to control his child's residence. Derek did not obtain parental rights, as a matter of Irish law, until February 2011, when an Irish court granted his petition for guardianship and joint custody of JMR.

This is right from the perspective of Ireland. Is it right from the perspective of Illinois too? What happens to the "habitual residence" issue when the jurisdiction in which the child is physically present does not view a change of residence as valid?

That question potentially matters because, although Ireland treats unmarried fathers as having no custodial rights, Illinois has a different approach. JMR was born in Illinois, and Derek acknowledged being the father. His name is on JMR's birth certificate. Under Illinois law, an acknowledged but unmarried father has some custodial rights, which go with obligations to support the child. 750 ILCS §45/14; see also slip op. 19 n.4. I do not want to resolve any issue of Illinois law (my colleagues correctly state that rights under the Hague Convention are a matter of federal law), but Illinois could well deem Mary's action in 2007 to have been a violation of Derek's rights—as Illinois understands those rights,

though not as Ireland understands them. And if Illinois would deem JMR's presence in Illinois to be unlawful, how can the time he spent in Illinois count toward acquiring "habitual residence" in Illinois?

My colleagues recognize that time in Illinois would not count toward habitual residence if Mary's unilateral removal of JMR from Derek's custody had violated Irish law. Slip op. 30–31, citing *Kijowska v. Haines*, 463 F.3d 583, 587 (7th Cir. 2006). So why would time in Illinois count toward habitual residence if Mary's unilateral removal of JMR from Derek's custody violated Illinois law? My colleagues do not address that question—nor did the parties, though we issued an order after oral argument directing them to do so. Perhaps they misunderstood the question. But the result is an opinion that discusses a subject that may matter to other cases (though likely not to this one) without considering a potentially vital issue.

I am not sure how this issue should be resolved, and I am content to let it pass because nothing we say here is likely to affect JMR's ultimate placement. The courts of Ireland and Illinois have made their decisions in adversarial litigation. It is time for this federal overlay to end and the subject be returned to the domestic-relations apparatus of Illinois and Ireland, where it should have been all along.